Gilbert **KINARD**, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

No. 21429.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 16, 1969.

Decided Feb. 24, 1969.

13. Taglavore v. United States, *supra* note 12.

454

Mr. William J. Kenney, Washington, D. C. (appointed by this court) for appellant.

Mr. Stephen M. Schuster, Jr., Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Miss Carol Garfiel, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and McGowan and LEVENTHAL, Circuit Judges.

PER CURIAM:

This is an appeal from a conviction of assault with a deadly weapon resulting in a sentence of one to three years. We affirm.

█ The evidence was sufficient for the case to go to the jury. No tainted evidence was offered by the prosecution.[1] The prosecution's witness, Mrs. Simpson, a former girl friend of appellant, testified that on February 3, 1967, appellant was with the Simpsons at their apartment, drinking. He left at 10 p. m. but returned around 4 a. m. to ask why Ethel Simpson had made an abusive phone call to his wife. An argument broke out. Artie Simpson urged appellant to "stop talking so loud" and put his hand on appellant's arm to show him out. Appellant pushed Artie Simpson across the kitchen. Simpson picked up an electric iron and hit appellant on the forehead. Then appellant drew a knife and cut Simpson across his right check.

█ Appellant claimed that Simpson not only pushed him, and came at him with the iron, but came at him with the iron a second time, saying he would kill him and bust his brains out. But this was a disputed matter for the jury.[2] The

---

1. Appellant claims violations of *Mallory, Miranda,* or *Wade-Gilbert-Stovall,* but no evidence resulting from these alleged violations was adduced.

2. (1) Defendant testified that Simpson had grabbed and pushed him (Tr. 149–50). This is in conflict with the account of Mrs. Simpson who had testified (Tr. 44–45) that her husband did not "grab" or "shove" defendant. "He didn't grab his arm, he just held his arm." (Tr. 44)

   (2) Mrs. Simpson admitted that defendant might have said to Simpson "Get your hands off me," but she testified (Tr. 45) she did not hear him also say "you're pushing me." (Defendant claimed he told Simpson not to push him any more. (Tr. 122) She also did not remember her husband saying to defendant he'd "knock your brains out" or "kill you" (Tr. 47), which is what defendant claimed. (Tr. 122)

   (3) The key point is defendant's testimony that Simpson came towards him twice with an iron. Apart from the fact that defendant's testimony is not particularly strong, *see* par. 8 below, it is enough to note here that Mrs. Simpson did not agree (though expressly asked on cross-examination) that her husband walked toward defendant *after* having hit defendant with an iron. (*See* Tr. 68)

   (4) Mrs. Simpson's account was this (Tr. 9): "Mr. Kinard pushed my husband back towards the window, and that's when my husband staggered up and got the iron and hit him with it. * * *

judge—who may well have been wondering why such affrays between people who describe themselves as "sort of friends" were brought to trial in District Court in summer—was certainly fair to defendant in every way. The judge instructed the jury with particular care on the question of self-defense, clearly placing the burden on the Government to prove beyond a reasonable doubt that the defendant's action did not represent reasonable force used in self-defense.

No reversible error is assignable to the fact that Artie Simpson was not called. Government counsel did not know until soon before the trial began

Q: And then what happened? * * * A: He reached in his pocket and got the knife (Tr. 9) * * * and cut my husband with it; and I screamed and run into the bedroom and got my child and run outside." (Tr. 12) She later stated that defendant used a switchblade knife, and that the cut ran on the left side of Simpson's face from above the ear over to his nose. (Tr. 12–13).

(5) Defense counsel, on motion for acquittal, claimed (Tr. 95) that the prosecutor's own witness testified on cross-examination that Simpson advanced towards Kinard with an iron after having struck defendant with the iron the first time. The trial judge said his recollection was different and denied the motion. (Tr. 95).

(6) As an appellate tribunal we have a limited office. We must be mindful that we do not have the benefit of impressions from the demeanor of the witnesses.

Also we do not have, nor does the record contain, the actions in the court room. That was not insignificant in this case. For example, at one point defense counsel got Mrs. Simpson to say on cross-examination (Tr. 48): "Q. Do you remember your husband advancing towards Gilbert with the iron." "A. Yes." But in context the jury had for consideration not only the inference of but one motion with an iron by Simpson, after he had been pushed, but also a demonstration of the kind of motion later described by defense counsel as "advancing". Defense counsel had asked whether Simpson had "swung the iron around in an arc." The witness replied—indicating with motions, as per request of defense counsel (Tr. 42)—

A He took the iron from the cabinet just like this and swung it over like this.

Q All right. Will the record indicate that the witness made a motion with her handbag from lower right to upper left and coming across.

THE COURT: The motion I saw was straight down.

THE WITNESS: He reached over on the cabinet and got the iron and hit him with it.

THE COURT: Well the jury knows. The record will show.

(7) It is not irrelevant, in terms of credibility, that Mrs. Simpson did admit, without any dissembling, various matters important to the defense position —in regard to her having defendant as a lover while married to Simpson; defendant's moving out; and particularly her making an abusive call to defendant's wife that night (Tr. 39), and defendant's having come back to the apartment to insist that she desist from calling his wife, etc. (Tr. 44).

(8) As for the testimony of defendant, as to Simpson's alleged second advance, his direct testimony was that Simpson "was coming towards me." (Tr. 122). Asked on cross-examination whether this was possibly merely Simpson's "momentum" of a couple of steps after having hit defendant, defendant answered: "I don't think so." (Tr. 153).

(9) While there is little doubt of the provocation, this was taken into account in the trial of the case. See, e. g., Tr. 16 for the ruling excluding proffer of testimony that a few minutes after the attack defendant allegedly said over the phone, "The next time I come back here I am going to kill you all." This was offered as probative of defendant's state of mind. The judge commented (of course, out of the presence of the jury):

"Well, I think if I had been hit over the head by an electric iron when I came to have a drink with some friends —I don't think that goes to show intent." (Tr. 16).

(10) Other factors the jury might have taken into account: Defendant's coming over at 4:00 a.m. while "upset" (Tr. 118) or "annoyed" (Tr. 139 and 160); defendant's having a switchblade knife; his loud talking; defendant's knowledge that he, aged 23, was considerably younger than Simpson (in his 40's), who he knew was "retired." (Tr. 138).

(11) The essential question is whether defendant reacted with excessive force to the provocation. We cannot say this was beyond the realm of dispute and jury determination.

on July 17, 1967, that Simpson could not be present, due to an epileptic seizure. Mrs. Simpson called Government's attorney on Monday, July 10, but did not mention any illness of her husband. On July 12, the Government sought a continuance until the week of July 17, because Simpson was on vacation two hundred miles away. Defense counsel objected to any further continuances. When Government counsel learned of Simpson's epileptic seizure, meaning he would not return for trial the following week, the Government decided to proceed without Simpson.

Simpson's absence did not cause defense counsel to seek a continuance, mistrial, or even a missing-witness instruction. Defense counsel used that absence to put it to the jury that Simpson was really not interested in pressing the charge—a tactic not without potency even though it did not achieve an acquittal. Now appellate counsel claims plain error in that the jury could not assess the self-defense claim in the light of an actual view of Simpson, his heft and his bulk. On the record before us we find no basis for reversal.

■ A final point raised by defendant is the delay in obtaining the transcript. The trial was held within four months after indictment, a promptness that was reasonable, and indeed unusual for this district. After trial the transcript was ordered December 21, 1967, and not delivered until May 23, 1968. Defendant has been in detention since the trial, but defense counsel frankly advised the court on argument that he did not press this court for release pending appeal not merely because the Government objected in district court on ground of dangerousness, but because the family was cheered by the vocational training being given appellant in Lorton Reformatory, a training that might well lead to a brighter future.

This court is much troubled by the problems of delay in furnishing transcripts,[3] for generally the lawyer on appeal is "lost without such a transcript."[4] This problem has been the subject of continued attention by the Judicial Council, the Chief Judge of the District Court and its Executive Committee and the Administrative Office, and a glimmer of improvement looms ahead.

Affirmed.

3. *Cf.* Holmes v. United States, 127 U.S. App.D.C. 332, 383 F.2d 925 (1967).

4. Gardner v. California, 394 U.S. 367, 89 S.Ct. 580, 21 L.Ed.2d 601 (U.S. Jan. 20, 1969).