UNITED STATES of America,
Appellee,

v.

Michael DESENA, aka Richie Bigfoot, Kevin Kiernan, aka Sideways, Orlando R. Placido, aka Ripcord, Richard Recchion, aka Ricky Magic, Robert Desautels, aka Bobby D, Thomas Vandiver, aka Tommy Trucker, aka Trucker, Louis Candelaria, aka B.C. Rock, William Sharpe, aka Tattoo Billy, Anthony Romeo, aka Eclipse, aka Fat Tony, Steven Deflorio, aka Sarge, Kirk Peters, Jay A. Clancy, aka One–Eye Jay, aka One–Eye, Gabriel Giordano, aka Gary, Christopher Socci, aka Hop Sing, Salvatore Figliolia, aka Stone Cold, aka Sal, Peter A. Mihalitsianos, aka Smooth, Anthony Dibiase, aka Tony the Wig, Evan Rosenthal, aka Rain, Nicholas Ragni, aka Mood, Robert J. Bauer, aka Bluto, Phillip Pepe, aka Philly, Michael Connors, aka Bam–Bam, Jorge Duquen, aka Kathleen M. Hawk, Joseph Serrano, aka Panhead Joe, Paul Borrero, aka Apache, Patrick Torres, aka Taco, Bryan Walton, aka Pogo, Halpin Scott, aka Holeshot, John Kolakowski, aka Loudmouth, Ralph Rubino, Douglas Jay Estep, aka Fat Boy, Defendants,

Anthony Lambros, aka Tony Intense, and Thomas La Duca, aka Tom–Tom, Defendants–Appellants.

Docket Nos. 00–1808, 01–1027.

United States Court of Appeals, Second Circuit.

Argued Nov. 15, 2001.

Decided April 9, 2002.

rather, for these violent outlaws, the squeal of rubber on concrete, the whine of a motorcycle's exhaust, and the report of random shots heard echoing in the wake of their departure from the scene.

John H. Jacobs, New York, N.Y. (Elizabeth E. Macedonio, Law Office of John H. Jacobs, New York, New York, of counsel), for Appellant, Lambros.

Valerie S. Amsterdam, New York, N.Y. (Amsterdam & Branden, New York, New York, of counsel), for Appellant, Laduca.

Gary R. Brown, Assistant United States Attorney, Brooklyn, N.Y. (Alan Vinegrad, United States Attorney, Jo Ann M. Navickas, Leonard Lato, Assistant United States Attorneys, Eastern District of New York, Brooklyn, NY, of counsel), for Appellee.

Before FEINBERG, CARDAMONE, and SOTOMAYOR, Circuit Judges.

CARDAMONE, Circuit Judge.

This appeal brings before us two of 33 co-defendants charged in a lengthy indictment with involvement in a large scale national criminal enterprise. According to the government, the Pagan Outlaw Motorcycle Club (Pagans), of which defendants are members, engaged not only in legitimate activity, but also "a broad array of racketeering activity" that involved various crimes of violence. For 50 years the Pagans have been engaged in a "turf" war with the rival Hell's Angels motorcycle club, which reportedly continues to this day. *See* Elissa Gootman, *Biker Attack Is Called Clash Over L.I. Turf,* N.Y. Times, Feb. 25, 2002, at B1. The charges in this case stem in part from the Pagans' efforts to keep the Hell's Angels out of Long Island, New York. As the record makes clear, the sounds of the skirmishes in this gang war are not the roar of cannon, but

## BACKGROUND

Defendants Anthony Lambros and Thomas Laduca are two of only four Pagan defendants to have gone to trial on the criminal charges against them. They appeal from judgments of conviction entered November 13, 2000 and December 19, 2000, respectively, in the United States District Court for the Eastern District of New York (Hurley, J.). Although defendants were charged within the same indictment, the issues before us arise out of different criminal incidents. Accordingly, we discuss separately the facts underlying their appeals.

### Lambros' Appeal

Lambros was found guilty of four counts of committing violent crimes in aid of racketeering activity. Two counts consisted of charges of assault with a dangerous weapon in violation of 18 U.S.C. § 1959(a)(3) (1994), and the other two counts charged conspiracy to assault with a dangerous weapon in violation of 18 U.S.C. § 1959(a)(6).

Only one count is pertinent to this appeal—the conspiracy charge pertaining to assaults on members of the Hell's Angels. Lambros asserted an entrapment defense, claiming that law enforcement officials—and Detective Jack Kennedy in particular—fed misinformation to biker groups to encourage tension between them. Kennedy was a member of the local police Biker Task Force who allegedly spent much time in surveillance of the Pagans. Lambros asserts Kennedy came to know each Pagan by name and would report to them what

harms were caused them by the Hell's Angels. The Pagans would then be incited to seek revenge. Lambros argues that without such information, no conspiracy against the Hell's Angels would have developed.

To establish this defense, Lambros planned to call Kennedy as a witness. Kennedy had been in the courtroom from time to time during the trial. Yet while the prosecution agreed to produce him without a subpoena, he failed to appear the day he was to testify. Appellant insists his Sixth Amendment right to compulsory process was denied, as well as his Fifth Amendment (Lambros mistakenly cites the Fourteenth Amendment) right to due process.

### Laduca's Appeal

Although the jury convicted Laduca on 13 counts, the district court overturned the convictions on two counts. Laduca challenges three of the remaining counts on this appeal for insufficient evidence. These counts relate to separate events, each of which is chronicled below.

### A. September 1997 Incident: Hunting for Hell's Angels in Hempstead

At trial the government produced an eyewitness, Evan "Rain" Rosenthal, a former Pagan who testified that he and Laduca spent an evening in September 1997 following a group of Hell's Angels. Laduca was charged with committing a violent crime in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(6) (1994), and using or carrying a firearm in connection with that violent crime in violation of 18 U.S.C. § 924(c) (1994), for the events of that evening. According to Rosenthal, their immediate goal was to avenge injuries sustained by Gabriel "Gary" Giordano, a fellow Pagan said to have been shot by a Hell's Angel.

Rosenthal testified that he drove around town while Laduca was armed with a 9 millimeter handgun. They spotted a group of six to eight Hell's Angels on motorcycles. Laduca loaded his gun and directed Rosenthal to follow them, saying he wanted to shoot one of the Hell's Angels and especially to "get" the prospect who had shot Giordano. They followed the group to a gas station and parked nearby. Although Laduca pointed his gun out the open car window, Rosenthal explained that no shooting occurred because the Hell's Angels pulled out from an exit on the other side of the station and did not drive by Rosenthal and Laduca. Rosenthal and Laduca later contacted two other Pagans, Orlando "Ripcord" Placido and Keith "Conan" Richter, who joined them in their pursuit. Richter was also armed. After following the Hell's Angels to several bars, Laduca again rolled down the passenger window of Rosenthal's vehicle and pointed his gun, but a vehicle came between them and his target. After nine hours of this hunt, Richter called the mission off for the night.

Giordano also testified for the prosecution and corroborated Rosenthal's testimony. While hospitalized for his injuries, Giordano was visited by Laduca, who allegedly told him that he, along with Rosenthal, Placido and Richter, had followed a group of Hell's Angels and tried to shoot one of them to avenge him. Appellant told Giordano he had not been successful because the police had been present at one point and at a later point a vehicle had blocked his view.

### B. October 1996 Incident: Searching for Cycle Lords in the Catskills

Another incident occurred earlier in October 1996, for which Laduca was charged under one count with using and carrying a firearm during a conspiracy to assault in

violation of 18 U.S.C. § 924(c)(1), or aiding and abetting the use of weapons in such a conspiracy to assault, in violation of 18 U.S.C. § 2(a) (1994). The incident involved about 60–80 Pagans and Pagan affiliates who had gathered in the Catskills to assault members of the Cycle Lords, a group affiliated with the Hell's Angels. Three Pagans who were part of that mission—Rosenthal, Nicholas "Mood" Ragni, and Kirk "Kick" Peters—as well as Scott "Holeshot" Halpin, the president of the Tyrants Motorcycle Club (Tyrants), testified for the prosecution.

According to Halpin, whose group was affiliated with the Pagans, the Pagans were having "problems" with the Cycle Lords in the Catskills. To resolve the problems, the head of the Pagan's Catskills chapter, a man known as "Timmy," organized a raid on a bar where the president of the local Cycle Lords chapter was said to live. Forty or 50 Pagans and Tyrants, some with ax handles, knives and guns, took part in this raid. No Cycle Lords were found. Undaunted, Timmy scheduled a larger raid for the following weekend. This second raid is a subject of this appeal.

Nicholas Ragni, who at the time was the head or "diamond" of the Pagan East Suffolk chapter, confirmed that the Catskill Pagans were having trouble with the Cycle Lords and wanted to "put a scare into them." Although Ragni did not take part in the first raid, he testified that he and other Long Island Pagans were summoned to take part in the second one. Specifically, Ragni recounted how "[w]e were all informed to go up there with rifles, with guns, and that Timmy would take us to two bars where these people hang out, if we caught them we were to beat the [s——] out of them." Rosenthal and Peters, two of the rank-and-file Pagans in Ragni's chapter, testified that they were ordered by Ragni to go upstate on a "mandatory" run but were not given any details in advance. Peters further stated it was not uncommon for the Pagan leadership to withhold details of plans from the general membership.

Halpin reported that Laduca drove from Long Island to the Catskills with Douglas Jay "Fat Boy" Estep on the October weekend scheduled for the second hunt of Cycle Lords. When the pair arrived, Estep stepped out of Laduca's van, reached behind the front passenger seat and removed two rifles from the back of the van as Laduca sat in the driver's seat, a couple of feet away. At some point that weekend, Laduca told Halpin that he planned to return to Long Island as soon as the raid was over.

After a general meeting with Timmy to review the raid's logistics, Ragni and the other diamonds met separately to discuss the use of weapons. Laduca, as diamond of the Nassau chapter, attended that meeting. Because the sheer number of participants was likely to attract police notice, the diamonds decided to let each member decide for himself whether to carry a weapon. The witnesses' accounts of what types of weapons were carried varied somewhat, but all the witnesses observed shotguns being carried by some members.

The troop of Pagans and Tyrants, including Laduca, visited at least two bars. The witnesses explained that they traveled in a caravan that included a small bus and several other vehicles. At each bar some of the group surrounded the building, while others "stormed" inside, one after another, and looked around for Cycle Lords. No Cycle Lords were found, but Estep assaulted a patron at the second bar, and another Pagan, Louis "B.C. Rock" Candelaria, fired a shotgun into the air.

## DISCUSSION

### I Lambros' Appeal

█ Lambros raises only one issue. He contends his constitutional right to compulsory process and due process were violated by the failure of Detective Kennedy, whom he had called as a defense witness, to appear. We review constitutional claims *de novo,* but accept a district court's factual findings unless they are clearly erroneous. *See United States v. Birbal,* 113 F.3d 342, 345 (2d Cir.1997). Here we find no constitutional error because the defense received the only remedy it requested at trial. When Kennedy failed to appear to testify, the defense requested that the trial court give a "missing witness" charge to the jury, and it did so. No other remedy was asked for, although the defense could have moved for a continuance or mistrial. *See Kinard v. United States,* 418 F.2d 453, 456 (D.C.Cir.1969) (per curiam).

█ Seeking only a missing witness charge was a strategic decision, and having failed to secure an acquittal, Lambros cannot now complain that other, unrequested remedies should have been granted *sua sponte* by the trial court. In other words, he waived those remedies. *See United States v. Yu–Leung,* 51 F.3d 1116, 1121–22 (2d Cir.1995). Even if Lambros did not waive his objection to the remedy, an aggrieved party is nevertheless responsible for calling the trial court's attention to a perceived error so as to afford the court an opportunity to remedy the problem at that time. Failure to alert the trial court results in a forfeiture of the objection, in which case we review the district court action only for plain error. *Id.* We find no plain error here.

█ We recognize that the Sixth Amendment guarantees a defendant the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. At the same time, a defendant who alleges a violation of due process and compulsory process due to a missing witness must show the witness would have provided "favorable evidence which was neither cumulative nor irrelevant." *Singleton v. Lefkowitz,* 583 F.2d 618, 623 (2d Cir.1978). Where the prosecution is responsible for the unavailability of a witness, the defendant's burden is lighter in this respect, *id.,* but does not disappear altogether.

Yet in this case there is no allegation or proof that the prosecution caused or contributed to Kennedy's absence. Lambros' counsel acknowledged before the district court that he believed the government made an effort to bring Kennedy into court. More important, Lambros has not shown Kennedy could not have been located had the defense requested a continuance. Nor has defendant suggested that he interviewed Kennedy to determine the substance of any testimony he might have provided. As a consequence, Lambros' efforts to show what favorable evidence Kennedy could have provided is nothing more than speculation.

Absent any effort on defendant's part to produce evidence that Kennedy would have testified favorably for the defense on relevant matters, his constitutional claims of a denial of compulsory process or due process may not succeed. We find no merit therefore to Lambros' argument on appeal and must affirm his conviction.

### II Laduca's Appeal

█ To succeed on his claims of insufficient evidence Laduca must show that no rational trier of fact, viewing the evidence in the light most favorable to the government, could have found him guilty beyond a reasonable doubt of the essential elements of the crimes charged. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct.

2781, 61 L.Ed.2d 560 (1979). We note at the outset therefore that a defendant making an insufficiency claim bears a very heavy burden. *See, e.g., United States v. Gonzalez,* 110 F.3d 936, 940 (2d Cir.1997).

### A. *Crime of Attempt: § 1959(a)*

In relevant part, 18 U.S.C. § 1959(a) provides that "[w]hoever [in aid of racketeering], . . . assaults with a dangerous weapon . . . any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished." The indictment specifically alleged that in September 1997 Laduca attempted to assault members of the Hell's Angels in Hempstead, New York "in violation of New York Penal Law Sections 20.00, 110.00 and 120.10." [1]

Under New York law, "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." N.Y. Penal Law § 110.00 (McKinney 1998). Hence, intent and conduct are each an element of attempt, *see People v. Coleman,* 74 N.Y.2d 381, 383, 547 N.Y.S.2d 814, 547 N.E.2d 69 (1989), and the government must prove both beyond a reasonable doubt.

### 1. *Intent*

First, the government must show the defendant had the specific intent to commit the underlying substantive crime, which in this case is assault in the first degree. Although under New York law a person can commit assault in the first degree in one of four ways, only two are relevant to this appeal: intending to cause

and causing serious physical injury to another by means of a deadly weapon or dangerous instrument, or intending to cause and causing serious and permanent disfigurement to another. N.Y. Penal Law § 120.10(1), (2) (McKinney 1998).

Rosenthal and Giordano testified that Laduca himself stated during the hunt and afterward that he intended to shoot a Hell's Angel. This constitutes proof of Laduca's intent to inflict serious injury on another. *Cf. People v. Bracey,* 41 N.Y.2d 296, 301, 392 N.Y.S.2d 412, 360 N.E.2d 1094 (1977) ("Thus far we have not had to consider the sufficiency of the evidence of intent principally because there has been an admission by the defendant or an accomplice that the act was done with a specific criminal purpose."). Although Laduca argues that Rosenthal was not a credible witness, on appeal we must "resolve all issues of credibility in favor of the jury's verdict." *United States v. Desena,* 260 F.3d 150, 154 (2d Cir.2001). Accordingly, we fully credit Rosenthal's testimony.

In addition, the jury could have inferred Laduca's intent from his actions and the surrounding circumstances. *See, e.g., People v. Smith,* 79 N.Y.2d 309, 315, 582 N.Y.S.2d 946, 591 N.E.2d 1132 (1992) (noting that where no direct evidence of defendant's mental state exists, the jury must infer *mens rea* circumstantially); *Bracey,* 41 N.Y.2d at 301, 392 N.Y.S.2d 412, 360 N.E.2d 1094 (same). By trailing the Hell's Angels with a loaded gun, taking aim on two occasions, and failing to get off a shot only because of circumstances beyond his control, the evidence sufficiently established Laduca's intent to commit an as-

---

**1.** Although the government may rely on either state or federal law to establish a predicate *substantive* crime, it is unclear whether § 1959 imports state law of *attempt and conspiracy* or whether federal law governs. For

purposes of this appeal, we need not decide that question because the defendant has not raised it as an issue and both parties have assumed that New York law of attempt governs.

sault. *See People v. Paris,* 189 A.D.2d 589, 589, 592 N.Y.S.2d 45 (1st Dep't 1993) (mem.) (finding evidence sufficient to infer intent when defendant aimed a loaded cross-bow pistol at the head of an unarmed victim and stated he was going to kill him).

Laduca counters that he gave up several "golden" opportunities to fire at a Hell's Angel, which he urges shows that he must not have wanted to shoot. Admittedly, the jury rationally could have construed the failure to discharge any shots during the pursuit as evidence of a lack of intent to commit assault. But that does not mean it was irrational for the jury to decide, given the testimony of Rosenthal and Giordano described above, that Laduca *did* plan to assault a Hell's Angel but was prevented from doing so merely by circumstances. Moreover, Rosenthal revealed that Laduca had plans to establish an alibi in the event he succeeded in shooting a Hell's Angel, from which the jury could have inferred he was not just "talking tough," but rather intended to shoot someone.

### 2. *Conduct*

Preparation alone is insufficient evidence of culpable conduct. *Bracey,* 41 N.Y.2d at 300, 392 N.Y.S.2d 412, 360 N.E.2d 1094. New York law requires that the government prove the defendant "engaged in conduct that came 'dangerously near' commission of the completed crime." *People v. Kassebaum,* 95 N.Y.2d 611, 618, 721 N.Y.S.2d 866, 744 N.E.2d 694, *cert. denied,* 532 U.S. 1069, 121 S.Ct. 2224, 150 L.Ed.2d 216 (2001). To satisfy the "dangerously near" standard, the defendant must have carried the project forward to within "dangerous proximity" of the intended crime, though he need not take the final step to effectuate that crime. *Bracey,* 41 N.Y.2d at 300, 392 N.Y.S.2d 412, 360 N.E.2d 1094; *People v. Fair,* 269 A.D.2d 91, 94, 711 N.Y.S.2d 196 (3d Dep't),

*leave to appeal denied,* 95 N.Y.2d 963, 722 N.Y.S.2d 480, 745 N.E.2d 400 (2000); *accord United States v. Andrello,* 9 F.3d 247, 249 (2d Cir.1993) (per curiam). The rationale behind the "dangerously near" or "dangerous proximity" standard is that it imposes criminal liability only in situations where the defendant's conduct caused "a sufficient risk of harm to be treated as a crime in itself." *Bracey,* 41 N.Y.2d at 299, 392 N.Y.S.2d 412, 360 N.E.2d 1094; *accord Coleman,* 74 N.Y.2d at 383, 547 N.Y.S.2d 814, 547 N.E.2d 69.

Laduca argues that simply pointing a gun at another person does not satisfy the conduct element of attempted assault under New York law. He further suggests that New York courts have established a "trigger test," according to which a defendant cannot be guilty of attempted assault with a firearm where it is not proven that his finger was on the trigger of the gun. *See People v. Acevedo,* 256 A.D.2d 162, 163, 683 N.Y.S.2d 499 (1st Dep't 1998) (mem.); *People v. Chandler,* 250 A.D.2d 410, 411, 673 N.Y.S.2d 100 (1st Dep't 1998) (mem.); *People v. Mendez,* 197 A.D.2d 485, 485, 603 N.Y.S.2d 44 (1st Dep't 1993) (mem.); *People v. Moore,* 165 A.D.2d 884, 885, 560 N.Y.S.2d 352 (2d Dep't 1990) (mem.).

In both *Chandler* and *Mendez,* the Appellate Division specifically noted the absence of evidence that the defendant's finger was on the trigger of the gun when aimed at another person. In each case, the court went on to hold that the defendant had not committed attempted murder because the state had failed to show the defendant came sufficiently near completion of the substantive crime of murder. *Chandler,* 250 A.D.2d at 411, 673 N.Y.S.2d 100; *Mendez,* 197 A.D.2d at 485, 603 N.Y.S.2d 44. Employing similar principles in *Acevedo* and *Moore,* the Appellate Division affirmed the defendants' convictions

after noting in each case that the defendant had his finger on the trigger of the gun. *Acevedo,* 256 A.D.2d at 163, 683 N.Y.S.2d 499; *Moore,* 165 A.D.2d at 885, 560 N.Y.S.2d 352. Although the charge at issue in this case is attempted assault, not attempted murder, we assume the conduct elements of the two crimes are analogous.

Nevertheless, we disagree with Laduca's suggestion that New York law establishes a bright-line rule that, in cases of attempted assault involving a firearm, the defendant must have had his finger on the trigger or gone so far as to fire an errant shot. Of course such conduct could satisfy the conduct element of the crime of attempt, but the New York courts maintain that a defendant would also be guilty if he *"otherwise* came 'very near to the accomplishment of the intended crime.'" *Chandler,* 250 A.D.2d at 411, 673 N.Y.S.2d 100 (emphasis added) (quoting *Mendez,* 197 A.D.2d at 485, 603 N.Y.S.2d 44).

 Laduca is correct, however, that simply pointing a gun at someone does not satisfy the *actus reus* requirement for attempted assault. *Cf. id.* (finding evidence that defendant pointed gun at police officer insufficient by itself to support attempted murder conviction). But in the case at bar, Laduca did more than point a gun. The proof here shows defendant came near—indeed dangerously near—to assaulting a Hell's Angel. Armed with a loaded gun, he directed Rosenthal to drive him around in pursuit of a band of Hell's Angels. He stated, both during the hunt and afterward, that he intended to kill a Hell's Angel to avenge an earlier shooting. Twice he leaned out of the car and pointed a loaded gun in the direction of a Hell's Angel. An eyewitness testified, and Laduca himself admitted to a fellow Pagan, that his efforts were thwarted on both those occasions by circumstances beyond his control. In addition,

he called on two other Pagans, one of whom was armed, to join the hunt. These additional facts distinguish the present case from *Chandler* and *Mendez.*

We find further support for our conclusion in *People v. Paris.* In that case, the Appellate Division affirmed a conviction for attempted assault when the defendant "pointed a loaded cross-bow pistol at the head of his intended unarmed victim and announced he was going to kill him." 189 A.D.2d at 589. As in the present case, the police in *Paris* appeared and the defendant did not shoot. In affirming the conviction, the court commented on the "nearly tragic result of defendant's actions." *Id.* Laduca, like Paris, nearly caused a tragic shooting.

### B. *Affirmative Defense of Abandonment*

 Finally, Laduca contends he abandoned any effort made to shoot a Hell's Angel that night in September 1997. He points out the hunt was called off without any shot having been fired and that no proof suggests he ever resumed tracking down these particular Hell's Angels. Under New York law, abandonment is an affirmative defense to the crime of attempted assault. *See* N.Y. Penal Law § 40.10(3) (McKinney 1998). But the renunciation of criminal purpose must be "voluntary and complete," *id.,* meaning it cannot be motivated by "(a) a belief that circumstances exist which increase the probability of detection or apprehension of the defendant or another participant in the criminal enterprise, or which render more difficult the accomplishment of the criminal purpose, or (b) a decision to postpone the criminal conduct until another time." *Id.* § 40.10(5).

Here, it was Richter, not Laduca, who called off the hunt, so that the jury could have concluded Laduca never renounced his criminal purpose. Further, there was proof that Laduca refrained from shooting

at the gas station because the Hell's Angels drove away from him rather than toward him, and that he did not shoot at the last bar because a vehicle interfered with his line of sight. Moreover, Rosenthal testified that the run was not called off permanently, but only suspended. This evidence would have allowed the jury to find that any renunciation, if it existed, was not "voluntary and complete." Consequently, in our view of this record, sufficient evidence exists to support Laduca's conviction for attempted assault.

### III Using or Carrying a Firearm During a Violent Crime: § 924(c)

█ In connection with both the September 1997 and October 1996 incidents, the government also charged Laduca under 18 U.S.C. § 924(c). This statute imposes a mandatory sentence on a defendant who "during and in relation to any crime of violence[,] uses or carries a firearm." It is considered a separate violation of federal law. *See United States v. Mohammed*, 27 F.3d 815, 820 (2d Cir.1994) ("A review of the plain language of section 924(c) and its legislative history leads us to conclude that the section was intended to impose an additional, consecutive sentence upon a defendant who commits *any* federal crime of violence while using or carrying a firearm.").

█ There are three elements to a § 924(c) violation. First, the defendant must have used or carried a firearm. The terms "use" and "carry" are not synonymous. *See Bailey v. United States*, 516 U.S. 137, 146, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *United States v. Cruz–Rojas*, 101 F.3d 283, 285 (2d Cir.1996). A defendant "uses" a firearm by actively employing it. *Bailey*, 516 U.S. at 143, 116 S.Ct. 501; *United States v. Santos*, 84 F.3d 43, 46 (2d Cir.) (per curiam), *modified on reh'g*

*by* 95 F.3d 116 (2d Cir.1996). "Active employment" can mean, among other things, "brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm." *Bailey*, 516 U.S. at 148, 116 S.Ct. 501. By contrast, a defendant "carries" a firearm by either bearing it on his person or "knowingly possess[ing] and convey[ing it] in a vehicle, including in the locked glove compartment or trunk of a car, which the person accompanies." *Muscarello v. United States*, 524 U.S. 125, 126–27, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998). A defendant may therefore be found guilty of carrying a firearm, even though not found to have actively employed it.

Second, the government must prove the defendant used or carried the firearm "knowingly." *See, e.g., United States v. Santeramo*, 45 F.3d 622, 623 (2d Cir.1995) (per curiam). Third and finally, there must be an underlying "crime of violence," defined by the statute as "an offense that is a felony and (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3). Further, the firearm must have been used or carried "during and *in relation to*" the underlying offense. *Id.* § 924(c)(1) (emphasis added).

With respect to the September 1997 hunt for Hell's Angels, Laduca concedes he carried a loaded gun that night. Nor does he dispute that an attempted assault constitutes a crime of violence. *See* 18 U.S.C. § 924(c)(3). The only challenge he raises is whether he committed an attempted assault in violation of 18 U.S.C. § 1959(a)(6). Since we have now affirmed

defendant's conviction on that charge, we can also affirm the weapons conviction.

With respect to the October 1996 search for Cycle Lords, the government presents two distinct theories of liability related to § 924(c). First, it argues that Laduca personally carried a gun in relation to the conspiracy to assault the Cycle Lords, which would be in direct violation of § 924(c). Second, the government posits that Laduca aided and abetted the use of weapons during the raid. *See* 18 U.S.C. § 2(a) (1994) (providing that any person who "aids, abets, counsels, commands, induces or procures [the] commission [of a federal crime], is punishable as a principal"). We must affirm the conviction if the evidence is sufficient to prove either theory. *United States v. Masotto*, 73 F.3d 1233, 1241 (2d Cir.1996). Because we find sufficient evidence for the jury to have convicted Laduca as a principal under § 924(c), we need not decide whether Laduca was guilty of aiding and abetting under § 2(a).

Starting with the third element of a § 924(c) violation, we have established that a conspiracy to commit a crime of violence is "a sufficient predicate crime of violence for the purposes of 18 U.S.C. § 924(c)." *United States v. Persico*, 164 F.3d 796, 802 (2d Cir.1999); *see also United States v. Patino*, 962 F.2d 263, 267 (2d Cir.1992) ("Thus, when a conspiracy exists to commit a crime of violence, such as kidnapping, the conspiracy itself poses a 'substantial risk' of violence, which qualifies it under Section 924(c)(1) and Section 924(c)(3)(B) as a crime of violence."). Laduca neither disputes that the conspiracy to commit assault qualifies as a crime of violence, nor challenges his conviction for participating in that conspiracy.

With respect to the element that the weapon was carried knowingly, the evidence produced at trial established that at some point Laduca was aware guns were being used by other members of the conspiracy. He was present at the second bar when Estep fired the shotgun. Moreover, the jury could have inferred that Laduca knew the two shotguns were in his van at the time he drove from Long Island to the Catskills. The weapons were large and located just behind the front passenger's seat, a couple of feet from him. Laduca's knowledge of the guns in his van is consistent with the testimony of Ragni, who like Laduca was a diamond, that the Pagans were told to bring themselves and weapons upstate on that October weekend.

Finally, the defense argues that Laduca did not perform any affirmative act with respect to any weapons in connection with the October 1996 conspiracy to assault Cycle Lords. To the contrary, the evidence shows Laduca drove his van, loaded with two shotguns, from Long Island to the Catskills. This suffices to demonstrate that, at least during the drive to the Catskills, Laduca "carried" weapons. *See Muscarello*, 524 U.S. at 126–27, 118 S.Ct. 1911; *see also Persico*, 164 F.3d at 802–03 (moving firearms from one place to another qualifies as "carrying" for the purposes of § 924(c)).

Hence, the only question is whether, at the time Laduca drove from Long Island to the Catskills, he knew or had reason to know that the trip was for the purpose of assaulting rival bikers. If so, then Laduca carried weapons "during and in relation to" the course of the conspiracy to commit assault, and the § 924(c) conviction is proper. Essentially, by arguing that he did not know of the conspiracy to assault the Cycle Lords until *after* he arrived in the Catskills, Laduca contends the government failed to produce sufficient evidence of the coincidence of the *mens rea* and *actus reus* elements of the offense.

We think a rational jury could have determined that, at the time he drove from Long Island, Laduca knew, or at least had reason to know, of the plan to hunt down and assault Cycle Lords. Significantly, Ragni, who held the same leadership position as Laduca, testified that the Pagans had been told to travel to the Catskills with weapons in order to assault the troublesome Cycle Lords. Even though two rank-and-file members of the Pagans testified that they did not know of the purpose of the trip until after they arrived, it was rational for the jury to conclude that Laduca was privy to the same prior information as Ragni because of his position of leadership and because Laduca in fact had weapons in his vehicle when he drove to the Catskills. In addition, Laduca announced he was returning to Long Island immediately after the raid, revealing he had no other purpose for being in the Catskills.

From this evidence, we believe a rational finder of fact could have found Laduca knowingly carried weapons in furtherance of the conspiracy to assault the Cycle Lords. Consequently, his § 924(c) conviction and sentence must be affirmed.

## CONCLUSION

For the foregoing reasons, the judgments of conviction are affirmed.