UNITED STATES of America,
Appellee,

v.

Joanna PIMENTEL, also known as
"La Madrina," George Viruet,
Defendants–Appellants,

Elvin Cruz;  Jorge Aponte, also known
as "Cano," also known as "John
Doe," Defendants.

Docket Nos. 01–1333(L), 01–1362(CON).

United States Court of Appeals,
Second Circuit.

Argued:  June 10, 2003.

Decided:  Oct. 8, 2003.

Jeremy Gutman, New York, NY, for Defendant–Appellant Joanna Pimentel.

Barry Gene Rhodes, Brooklyn, NY, for Defendant–Appellant George Viruet.

Catherine Friesen, Assistant United States Attorney for the Eastern District of New York (Susan Corkery, Assistant United States Attorney, Pamela Chen, Assistant United States Attorney, and Roslynn R. Mauskopf, United States Attorney, of counsel), for Appellee.

Before: MINER and CABRANES, Circuit Judges, and DRONEY, District Judge.*

---

MINER, Circuit Judge.

These appeals arise from the January 9, 1995 gang-related murder of Galiat Santiago. Instead of being tried in New York State Supreme Court for violating the New York Penal Law, defendants-appellants Joanna Pimentel and George Viruet (collectively, the "Defendants") were tried by a jury and convicted in the United States District Court for the Eastern District of New York (Johnson, *J.*). The Defendants were charged with violations of various federal laws, including the Violent Crimes in Aid of Racketeering ("VCAR") statute, 18 U.S.C. § 1959. VCAR provides for the federal prosecution of violent crime "when those allegedly responsible participated in the violent crime in order to gain, maintain, or increase a position in an enterprise engaged in racketeering activity." *United States v. Feliciano*, 223 F.3d 102, 107 (2d Cir.2000). The specific counts of conviction included: (1) conspiracy to murder Santiago for the purpose of maintaining a position in a racketeering enterprise, in violation of 18 U.S.C. § 1959(a)(5); (2) murder of Santiago in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (3) use of a firearm during and in relation to crimes of violence (i.e., the conspiracy to murder Santiago and the murder of Santiago), in violation of 18 U.S.C. §§ 924(c)(1) and 2; and (4) murder of Santiago through the use of a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(j)(1) and 2. Each of the Defendants was sentenced principally to a mandatory term of life imprisonment.

On appeal, the Defendants do not deny that they participated in Santiago's murder. Rather, they principally argue that their convictions cannot stand because (1)

---

* The Honorable Christopher F. Droney, of the United States District Court for the District of Connecticut, sitting by designation.

the evidence presented at trial was insufficient to support a guilty verdict, and (2) in both its charge to the jury and its response to a note from the jury, the District Court declined to define the specific elements of the underlying racketeering acts alleged in the indictment, i.e., murder, attempted murder, and drug trafficking. For the reasons set forth below, we find that (1) the evidence was sufficient to support the Defendants' convictions, and (2) the District Court's jury instructions, while deficient, were not deficient enough to warrant a new trial given the quality and quantity of the evidence underlying the racketeering acts.

## BACKGROUND

At the trial below, both the Government and the Defendants called witnesses and presented other evidence regarding the purpose and activities of the Netas and the acts alleged in the indictment. We summarize here that testimony and evidence, which of course we view in the light most favorable to the Government. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Dhinsa*, 243 F.3d 635, 648–49 (2d Cir. 2001).

I. *Defendants' Membership in the Netas*

The Defendants and Santiago were members of the Netas, a gang that originated in the prison system in Puerto Rico. The Netas is largely made up of ex-convicts and members of the prison population throughout New York and New Jersey. The organization consists of various chapters, some of which allegedly are engaged in many acts of community service, notably helping senior citizens and the homeless, cleaning up parks, and assisting charities. In addition, the Netas claim to help ex-convicts live positive, crime-free lives and to ensure the fair treatment of prisoners.

In furtherance of its goals, the Netas maintains a complex, hierarchical structure and system of governance with strict rules of behavior that are brutally enforced. The Netas allegedly forbids its members from participating in any criminal activities, including the sale and use of narcotics, notwithstanding the fact that individual members do not always adhere to these rules. The Netas has developed its own "justice system" to enforce its behavioral rules. When a member is alleged to have violated one of these rules, a trial of sorts is held. Members who have been "convicted" of the "crimes" with which they were charged have been sentenced to verbal reprimands, loss of rank, physical assaults, and sometimes death.

Since July 1994, Pimentel has been the "Madrina" or "godmother" of the New York Netas. As the Madrina, she is responsible for coordinating efforts to communicate with prison officials regarding the treatment of inmates, to protest prison conditions, and to make sure that inmates receive appropriate medical care. Viruet was the president of the Jamaica chapter of the Netas and one of Pimentel's lieutenants. When Pimentel became the Madrina, the Netas members in Brooklyn, New York were divided among loosely organized chapters that were governed by Santiago, a president of one of those chapters. During 1994, at the direction of imprisoned members of the Netas leadership, Pimentel and Manuel Garcia (another Neta member) allegedly worked together in an attempt to coordinate and pacify the Netas chapters in Brooklyn, as well as to eliminate the sale and use of narcotics by those chapters. In the Fall of 1994, Pimentel established a committee called the "Junta Central" to govern the various Netas chapters in New York City. Santiago was not invited to join this committee.

## II. *The Attempt to Murder Santiago*

In 1994, Pimentel and Garcia began investigating allegations that Santiago had raped several female Netas members. Under the Netas' rules of conduct referenced above, rape was punishable by death. According to Garcia, who testified pursuant to a cooperation agreement with the Government, in August or September of 1994 (before Pimentel established the Junta Central), she ordered him to "get rid of [Santiago]." Garcia testified that he unsuccessfully attempted to kill Santiago by obtaining two guns and then spending one evening looking for him in the area of Sunset Park, "where he used to hang out at nighttime." Having failed to locate Santiago on this one evening, Garcia abandoned his mission.

## III. *The Murder of Santiago*

After forming the Junta Central, Pimentel decided to put Santiago "on trial" for the alleged rapes of Netas members. Following his release from prison in November 1994, defendant Jorge Aponte, a member of the Netas, assisted Pimentel and Garcia in conducting a "pretrial" investigation. As part of this investigation, Aponte interviewed Santiago with regard to the allegations. Following this investigation, Santiago was "tried" by the Netas before a "jury" consisting of all the presidents of the various Netas chapters, which "convicted" him and, after deciding not to execute him, "sentenced" him principally to a physical beating and the loss of his rank. After receiving his beating, Santiago left the meeting visibly upset, and on his way out began making threats against Pimentel and the Netas. Pimentel ordered that Santiago be watched. Shortly thereafter, Santiago, carrying a revolver, angrily told Aponte that he was going to kill Pimentel and Garcia. Aponte then paged Garcia to report Santiago's threat.

In response to Santiago's threats, Pimentel ordered his murder. On the evening of January 9, 1995, Viruet drove Garcia and Aponte to Santiago's house. While Viruet waited in the car, Aponte called out to Santiago to come to the door. When Santiago came to the door, Garcia shot and killed him. Garcia and Viruet then drove to Pimentel's house and informed her that Santiago was dead.

There was conflicting testimony concerning Pimentel's role and motives in Santiago's murder. Aponte testified that Garcia called him back after receiving his page, went to Aponte's house, and the two of them went out looking for Santiago. But, according to further testimony by Aponte, it was during this visit that Pimentel told Aponte that Santiago "had a lot of people scared" and "had to be whacked because [Pimentel] had a child." Aponte then agreed with Pimentel that Santiago should be killed and told her "okay, green light."

Garcia's testimony also suggested Pimentel's involvement. He testified that it was Pimentel, not himself, who returned Aponte's page and that Pimentel told Aponte and others about Santiago's threats. According to Garcia, Pimentel said: "You know what you have to do. [Santiago has] to go." Garcia testified that, when he and Aponte went looking for Santiago, Aponte was fully aware of the reasons why they were looking for him and that Aponte had bragged about his good aim in an effort to convince Garcia to let him shoot Santiago. Garcia further testified that, when Viruet and another Netas member named Michael Sisson arrived at the apartment, Pimentel "told them what happened, what I was going to do," and that she "wanted them to go with me." Garcia also testified that, while Viruet was driving them away from the murder scene, Garcia received a page from Pimentel indi-

cating that she knew the mission had been completed. Garcia claimed that, when he arrived back at Pimentel's apartment, the people there were "celebrating," and Pimentel indicated that she had already heard about what had happened. When others tried to talk to Garcia about the murder, he told them to "forget about it" and went out for a walk.

Finally, Sisson testified that, on the night of the murder, Pimentel spoke of a need to kill Santiago to the people who were assembled at her apartment, saying that "she [was] worried [Santiago] [was] going to come after them" and that she wanted "to get rid of him." Sisson also testified that, when Pimentel asked Garcia what happened upon his return from the murder scene, Garcia provided a detailed account of the shooting to her.

## IV. The Murder of Darryl DeJesus in Pennsylvania

Other than the murder of Santiago, the only other homicide that occurred during the period relevant to the indictment, about which there was trial testimony, was Garcia's murder of Darryl DeJesus in Lancaster, Pennsylvania in March 1995.[1] In Garcia's sworn plea allocution from a separate proceeding that was introduced at the Defendants' trial, Garcia stated that he had been sent on a "mission" by Pimentel to provide assistance to a Netas chapter in Allentown, Pennsylvania, but that "before that complaint came down, this other woman, she lives in Manhattan ... offered [him] the opportunity to go to Lancaster where her sister was with drugs" and needed someone to act as her "security" while her husband was in jail. The name of his friend's sister was "Cuchi." Garcia stated that Pimentel told him that he should "take a little vacation, go to Lancaster and at the same time take care of what was going on in Allentown." Garcia stated that, while in Lancaster, he "bumped into this situation where some guys was going into war with the lady where I was staying at" and they "put me in a position like what I was going to do about it." On the day DeJesus was killed, Garcia, anticipating that he might run into these individuals, armed himself with a semiautomatic pistol and was "ready to, if [he] bump[ed] into these guys, to go over there and get them out of the way, finish what was going on between us so [he could] finish doing the violations and the thing [he] went there to do."

In his testimony at the trial below, Garcia for the first time claimed that Pimentel had been consulted before the woman in Manhattan recruited him to help her sister in Lancaster, and he vaguely asserted that "they" had sent him there to handle a "problem" that the sister had. According to Garcia, the nature of the "problem" he was to address was not made clear before his departure: "I was not told exactly what was the problem and I found out later when I got there."

The events leading up to DeJesus' murder began when DeJesus and his brother

1. Garcia was arrested about ten minutes after shooting DeJesus, while still in possession of the gun he had used both in that crime and in the murder of Santiago a little more than two months earlier. After Garcia was convicted of murder by a Pennsylvania jury, he was sentenced to life imprisonment, but his conviction was reversed on appeal. While he was awaiting a retrial, Garcia was approached by representatives of the Government, who advised him that the gun and other evidence implicated him in the murder of Santiago. He then entered into a cooperation agreement, pursuant to which he pled guilty to both murders as violations of 18 U.S.C. § 1959(1) in exchange for not receiving the death penalty for killing Santiago and with the hope that he would receive a sentence of less than life imprisonment.

entered a restaurant where Garcia and Cuchi were eating, and DeJesus began "making remarks" to Garcia. According to Garcia, DeJesus' brother was telling DeJesus that Garcia had "an eye problem.... He was saying I was looking at him but he was talking out loud. He was saying this little guy got a problem. I don't know who he thinks he is. He better check coming down here like that, saying things like that." The following day, Garcia was in a car with Cuchi when they saw DeJesus and his brother "hanging out on the corner." Cuchi drove around the block, stopped the car, and asked Garcia what he was "going to do about it." In response, Garcia told her to wait while he went around the block to shoot the two brothers and their companions. He then shot DeJesus.

On cross examination, Garcia explained the connection between his "mission" and his murder of DeJesus as follows:

> When I was sent to go to Pennsylvania, like I said from the beginning, I was sent to go check on a problem in Allentown, bring some manitos, check on another problem they knew the sister had in Pennsylvania. I was not told what was the problem. I was told to check the problem when I got there.

> When I went to Pennsylvania, those was the guys they was already having problems with Cuchi and Cuchi's family. So, Lancaster is small, rural, everybody knows each other. When they started seeing me with Cuchi and them, so they started making remarks and they didn't like me from the beginning. In the restaurant that incident we had, after that incident then I learned later the problem that they had was before I went to Lancaster, they had an argument over a parking space with Coca, that's ... Cuchi's niece.....

They got into an argument with these guys over the parking lot and they started, they jumped [Cuchi's daughter] and when [Cuchi's niece] tried to break it up, they jumped [her] too, and her husband. As a result, [Cuchi's niece] had a miscarriage, she lost the baby. The police got involved and everything, nobody got prosecuted and that was the problem that they had from the beginning which I was sent for, that I was sent to Lancaster for.

Q: That's why you had to commit a murder?

A: It happened at the time, yes.

Q: It happened?

A: Yes.

Q: You made it happen.

A: I was put in a position where I had to.

Q: Well, isn't what happened that a woman said to you what watcha goin' to do? Isn't that what happened?

A: No, what happened was I was sent on a mission up there and I did what I had to do.

In addition to the testimony pertaining to the murder of DeJesus, the Government presented testimony that the Netas endorsed execution as a sanction for violating certain Netas rules. In particular, Garcia testified that the Netas' punishment for rape or for being a "snitch" was execution. Moreover, at the Defendants' trial, Special Agent Jeffrey Ringel of the Federal Bureau of Investigation testified that, following Pimentel's arrest, "[w]hen asked if she was aware of the violence connected with the Netas, [Pimentel] claimed that they used to beat up members ... and were responsible for the murder of [four individuals]."

## V. *Netas Efforts to Murder Members of a Rival Group*

During the Defendants' trial, Garcia testified about another shooting that occurred in September or October of 1994. He described the relevant events as follows:

> I was with Caveman [another member of the Netas] there and some guys came running from the organization, from the Netas. They said they was having a fight with the Papichulos [another gang]. So, Caveman, I, [and] some other guys from the chapter started running over there. We got into a fight with them and I had cut one of them with a razor.
>
> . . . .
>
> They was throwing bottles at some Latin Queens, some Netas, guys and girls passing through there, cursing them out, saying words and throwing bottles.
>
> . . . .
>
> [Twenty to twenty-five minutes later, a] cab pulled over and three guys got out of the car. One of them had a bat. The other one had a shotgun. They crossed the street, but before they came around the corner, Caveman had some guys on the roof watching. The guys started throwing bottles at the Dominicans [i.e., the Papichulos]. When the Dominicans looked at them, Caveman looked at the Dominicans, they started running, went inside the building. I seen Caveman, he opened up a window, he came out but he had a Mach–10 in his hand.
>
> . . . .
>
> That's also like a machine gun, too, automatic weapon. He started screaming the Dominican's gang leader, Felipe. He says I know it's you. Show your face. He shot one up, Felipe, came out, started shooting with the shotgun. Caveman just started spraying them with the gun and the guy started—the guys running, they left, that was it that day.

## VI. *The Indictment*

Pimentel, Viruet, and Aponte were subsequently indicted by a federal grand jury for Santiago's murder. With respect to the Netas, the indictment alleged that, during the period September 1994 to January 1998, the gang (1) was a "criminal organization whose members and associates engaged in various forms of criminal activity[,] including murder, drug trafficking, unlawful dealing in firearms and assault"; and (2) "through its members and associates, engaged in racketeering activity as defined in [18 U.S.C. §§ 1959(b)(1) and 1961(1)], namely, murder and attempted murder, in violation of the laws of New York and Pennsylvania, and drug trafficking, in violation of [21 U.S.C. § 846]." The indictment further alleged that the Netas' members and associates sought, among other things, to:

a. Preserve and protect the power, territory and profits of the Netas through the use of intimidation, violence and threats of violence;

b. Promote and enhance the criminal activities of the Netas and its members and associates; and

c. Keep victims in fear of the Netas and its members and associates through violence, intimidation, and threats of violence.

Furthermore, the members and associates of the Netas allegedly "participated in the conduct of the affairs of the enterprise" by:

a. Committing, attempting to commit and threatening to commit acts of violence, including murder, attempted murder, and assault to protect and expand the Netas' criminal operations;

b. Using and threatening to use physical violence against various individuals, including members of rival criminal organizations; and

c. Using and threatening to use physical violence against members of the Netas who violated the internal rules of the enterprise.

With respect to the conduct of the individuals named in the indictment, Count One alleged that Pimentel, Viruet, and Aponte, "for the purpose of gaining entrance to and maintaining and increasing [their] position[s] in the Netas, an enterprise which was engaged in racketeering activity ..., knowingly and intentionally conspire[d] to murder ... Santiago," in violation of 18 U.S.C. § 1959(a)(5). Count Two alleged that Pimentel, Viruet, and Aponte, "for the purpose of gaining entrance to and maintaining and increasing [their] position[s] in the Netas, an enterprise which was engaged in racketeering activity ..., knowingly and intentionally murder[ed] ... Santiago," in violation of New York Penal Law §§ 125.25 and 115.05, as well as 18 U.S.C. § 1959(a)(1), 2. Count Three alleged that Pimentel, Viruet, and Aponte "knowingly and intentionally use[d] and carr[ied] ... firearm[s] during and in relation to a crime of violence," in violation of 18 U.S.C. § 924(c)(1), 2. And Count Four alleged that Pimentel, Viruet, and Aponte, in the course of violating 18 U.S.C. § 924(c), "knowingly and intentionally caused the death of [Santiago] through the use of a firearm," in violation of 18 U.S.C. §§ 924(j)(1), and 2. Prior to trial, Aponte pled guilty to participating in Santiago's murder.

VII. *The Trial and the Jury Charge*

In January and February 2001, Pimentel and Viruet were tried together. The trial lasted approximately three weeks, during which the Government called a number of witnesses. Several of these witnesses, some of whom testified pursuant to cooperation agreements, discussed the structure and practices of the Netas and the respective roles of Pimentel and Viruet in Santiago's murder. Viruet testified on his own behalf, admitting that he drove the getaway car but denying that he knew they were driving to Santiago's house to kill him. Instead of denying that they were involved in Santiago's murder, the Defendants sought to establish that the Netas was not an enterprise that engaged in "racketeering activity," as that term is defined in 18 U.S.C. § 1961, and that Santiago's murder had not been committed in order to "maintain[ ] or increase their position[s] in" a criminal enterprise, as required by 18 U.S.C. § 1959(a).

During the charging conference, Pimentel's counsel requested that the proposed jury instructions be amended to include references to the elements of the crimes that the Government alleged constituted the racketeering activities, including "murder," "attempted murder," and "drug trafficking" as those terms were used in the proposed charge. The Government objected to expanding the proposed charge, explaining that the proposed instruction was "exactly the [charge] used over and over again in [§ ] 1959 cases" and that it would be "very confusing and burdensome for the jury to have to consider four or five more elements for each of the racketeering acts." The District Court declined to amend the proposed charge. As a result, the discussion of "racketeering activity" in the District Court's charge to the jury consisted of nothing more than: (1) paraphrasing the indictment's allegations that the Netas "engaged in racketeering activity, as defined in the United States Code, namely, murder, attempted murder and drug trafficking, activities that violate state or federal law"; (2) reading Counts One and Two of the indictment and the

relevant portions of 18 U.S.C. § 1959, all of which refer to an enterprise "engaged in racketeering activity"; and (3) instructing the jury that the first element of proof common to both charges was that "during the time period relevant to this count, an enterprise existed which was engaged in racketeering activity affecting interstate commerce." Thus, the District Court did not make any effort to explain any particular findings the jury would have to make to conclude that the Netas engaged in conduct that would constitute murder, attempted murder, or drug trafficking that was in violation of "state or federal law."

During its second day of deliberations, the jury sent a note to the District Court requesting that the court provide it with "the legal definition of trafficking." The District Court proposed to answer this question by referring the jury to the term trafficking "as it is in the charge." The Defendants' counsel objected to this proposed response, and requested that the term "trafficking" be defined for the jury. In making this request, counsel noted that he had foreseen such a problem with the jury charge before it was given and had unsuccessfully requested that the charge be amended to include a definition of trafficking. The District Court declined to provide the jury with a definition, and instead responded to the note by instructing the jury to look at three pages of the charge where the word "trafficking" was used: "I'm not going to define that for them .... I will tell them they have to look at the word in the context of the sentence or paragraph in which it is used, and they will have to define it themselves."

When the jurors returned to the courtroom, the District Court told them:

I cannot define this word trafficking in the abstract, but what I will do is, I refer you to the charge that I gave, and you look at that word in the context that it is used. I refer you to page 40 of the charge. I refer you to page 41 of the charge. To be specific, page 40, if you look at the last line of the last full paragraph on page 40; and then if you look at the third line of page 41; and you look at the last line of page 45 of the charge.

The following day, the jury convicted Pimentel and Viruet on all four counts with which they were charged. These timely appeals followed.[2]

## DISCUSSION

On appeal, the Defendants principally argue that: (1) the evidence at trial was legally insufficient to establish that (a) the murder of Santiago was committed to "maintain[ ] or increase their position[s] in" the Netas organization, as required by § 1959(a); and (b) the Netas engaged in "racketeering activity" as that term is defined in 18 U.S.C. § 1961; and (2) the District Court's charge to the jury was deficient in that it failed to define the specific elements of the underlying racketeering acts alleged in the indictment. For the reasons set forth below, we reject the Defendants' challenges concerning the sufficiency of the evidence. Furthermore, we find that the District Court's charge to the jury, while deficient, was not deficient enough to warrant a new trial given the quality and quantity of the evidence underlying the racketeering acts.[3]

2. We note with displeasure the fact that the notices of appeal were not included in the Joint Appendix, as required by 2d Cir. R. 30(d).

3. The Defendants also raise the following additional arguments on appeal concerning the jury instructions: (1) the instructions failed to distinguish between activities engaged in by the Netas enterprise from activities engaged in by individuals who were members of the

## I. *Sufficiency of the Evidence*

### A. *Standard of Review*

The standard under which we review a challenge to the sufficiency of the evidence in a criminal trial is a familiar one:

A defendant challenging a conviction based on a claim of insufficiency of the evidence bears a heavy burden. *See United States v. Walsh*, 194 F.3d 37, 51 (2d Cir.1999). The evidence presented at trial should be viewed "in the light most favorable to the [G]overnment, crediting every inference that the jury might have drawn in favor of the [G]overnment." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir.1999) (quotation marks omitted) .... We consider the evidence presented at trial "in its totality, not in isolation," but "may not substitute our own determinations of credibility or relative weight of the evidence for that of the jury." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir.2000). "We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir.1998). Accordingly, we will not disturb a conviction on grounds of legal insufficiency of the evidence at trial if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also United States v. Naiman*, 211 F.3d 40, 46 (2d Cir.2000).

*Dhinsa*, 243 F.3d at 648–49. With this deferential standard of review in mind, we now turn to the Defendants' challenges to the evidence underlying their convictions.

### B. *Position–Related Motivation Requirement of VCAR*

█ The VCAR statute authorizes the Government to prosecute defendants for "violent crimes intended, inter alia, to permit a defendant to maintain or increase [her] position in a RICO enterprise." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir.1992). The Defendants first challenge the sufficiency of the evidence establishing that they killed Santiago for the purpose of "maintaining or increasing" their positions in the Netas. Specifically, they argue that they killed Santiago out of fear that he would kill them and to prevent him from doing so. "Although [§ ] 1959(a) does not define the phrase 'for the purpose of ... maintaining or increasing [a defendant's] position in an enterprise,' we interpret that phrase by its plain terms ..., giving the ordinary meaning to its terms." *Dhinsa*, 243 F.3d at 671. "Thus, on its face, [§ ] 1959 encompasses violent crimes intended to preserve the defendant's position in the enterprise or to enhance [her] reputation and wealth within that enterprise." *Id.* (emphasis omitted). As we explained in *Concepcion*, 983 F.2d at 381, the Government is not required "to prove that maintaining or increasing [a defendant's] position in the RICO enterprise was the defendant's sole or principal motive." Rather, we have consistently held that "the motive requirement is satisfied if

Netas; (2) the instructions failed to indicate that the Government had the burden of proving that Pimentel's position in the Netas involved promoting the illegal, racketeering activities of the Netas; and (3) the instructions contained a misleading and prejudicial explanation of the District Court's discretion to sentence cooperating witnesses. The Defen-

dants also argue that their motion for a new trial should have been granted by the District Court based on certain allegedly exculpatory information provided to them by the Government after the trial. We find merit in none of these arguments and affirm the District Court's rulings with respect to these issues.

'the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" *Dhinsa*, 243 F.3d at 671 (quoting *Concepcion*, 983 F.2d at 381).[4]

Viewing the evidence in the light most favorable to the Government, the jury could have inferred beyond a reasonable doubt that the Defendants murdered Santiago to maintain or increase their positions in the Netas. That evidence established that, throughout the Fall of 1994, Pimentel consolidated her power, freezing out Santiago from his leadership position and surrounding herself with people like Garcia and Viruet, who were loyal to her. After his "trial," Santiago was stripped of his rank, and when he responded with anger, Pimentel ordered him to be watched. When Santiago continued to threaten Pimentel and Garcia, she ordered his murder. Based on this evidence, the jury was entitled to conclude that Pimentel ordered Santiago's murder to preserve and cement both her authority as a leader of the Netas and her control over the discipline of the Netas' members. Similarly, the jury was entitled to conclude that Viruet, a loyal chapter president, participated in the murder to advance his own position within the Netas.

### C. *Racketeering Acts Committed by the Netas*

■ The Defendants also argue that the evidence was insufficient to support the jury's finding that the racketeering acts charged in the indictment were committed by the Netas. To sustain a conviction for violating VCAR, the Government must also prove beyond a reasonable doubt that the criminal enterprise "in relation to which the charged crimes were allegedly committed was 'an enterprise engaged in racketeering activity.'" *Feliciano*, 223 F.3d at 113 (quoting 18 U.S.C. § 1959(a)). VCAR "expressly adopts the definition of 'racketeering activity' set forth in [RICO]," *id.*, which defines that term to include, in relevant part, "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in [21 U.S.C. § 802]), which is chargeable under State law and punishable by imprisonment for more than one year ... [or] any offense involving ... a controlled substance ... punishable under any law of the United States." 18 U.S.C. § 1961(1)(A), (D). VCAR further defines an "enterprise" as "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1959(b)(2).

As discussed above, the Government sought to establish that the Netas, "through its members and associates, engaged in racketeering activit[ies] ..., namely murder and attempted murder, in violation of the laws of New York and Pennsylvania, and drug trafficking, in violation of [21 U.S.C. § 846]." Thus, the Government was required to prove as an essential element of the charged VCAR offenses (as well as the firearms offenses)[5]

---

**4.** *See also United States v. Diaz*, 176 F.3d 52, 94–95 (2d Cir.1999); *United States v. Reyes*, 157 F.3d 949, 955 (2d Cir.1998); *United States v. Polanco*, 145 F.3d 536, 540 (2d Cir. 1998); *United States v. Thai*, 29 F.3d 785, 817 (2d Cir.1994); *United States v. Rosa*, 11 F.3d 315, 340–41 (2d Cir.1993); *United States v. Locascio*, 6 F.3d 924, 940 (2d Cir.1993).

**5.** As the District Court properly observed in its instructions to the jury, if the Government failed to establish that the Defendants committed the VCAR offenses, the jury could not

that the Netas, through its members and associates, engaged in drug trafficking that would constitute substantive narcotics offenses, in violation of 21 U.S.C. § 846, or acts involving murder or attempted murder, in violation of New York or Pennsylvania law. Moreover, as we observed in *Feliciano,* "where a substantial portion of the activities of a 'union or group of individuals associated in fact although not a legal entity' are conducted in violation of law, the necessity that informal groups can only act through their individual members (who do not have legally recognized agency status) is particularly apparent." 223 F.3d at 116 (quoting 18 U.S.C. § 1959(b)(2) (footnote omitted)); *see also United States v. Cutolo,* 861 F.Supp. 1142, 1146 (E.D.N.Y.1994) ("An enterprise, here a group of individuals associated in fact, can only act through its members, associates, or employees."). Thus, "[w]here individuals are associated only 'in fact,' determining whether the subject enterprise engaged in racketeering activity requires fact-based attention to the ways in which . . . the individuals acted for the group and/or in concert with other members, or acted in ways that contributed to the purposes of the group, or that were facilitated or made possible by the group." *Feliciano,* 223 F.3d at 116–17.

With these principles in mind, we presently turn to each of the specific racketeering activities charged in the indictment and the question of whether there was sufficient evidence to support the jury's finding that the Netas, through its members and associates, engaged in these activities. In doing so, we are mindful that, in returning a general verdict of guilty, the jury made no specific findings regarding

whether the Netas engaged in one or all of the racketeering activities alleged in the indictment. Consequently, we must affirm the convictions in the event that we find sufficient evidence to establish that the Netas committed at least one of the charged racketeering activities. *See Griffin v. United States,* 502 U.S. 46, 49–50, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) ("'[I]t is settled law in this court, and in this country generally, that in any criminal case a general verdict and judgment on an indictment or information containing several counts cannot be reversed on error, if any one of the counts is good and warrants the judgment, because, in the absence of anything in the record to show the contrary, the presumption of law is that the court awarded sentence on the good count only'" (quoting *Claassen v. United States,* 142 U.S. 140, 146, 12 S.Ct. 169, 35 L.Ed. 966 (1891))); *United States v. Masotto,* 73 F.3d 1233, 1241 (2d Cir.1996) ("When the jury is properly instructed on two alternative theories of liability, as here, we must affirm when the evidence is sufficient under either of the theories.").

### 1. Attempted Murder

With respect to racketeering activity of attempted murder, we conclude that the evidence was sufficient to support a finding that the Netas, through its members and associates, was engaged in racketeering during the period covered by the indictment. Although evidence of Garcia's attempt to kill Santiago in August or September of 1994 at Pimentel's direction was insufficient to establish attempted murder under New York case law, evidence of the Netas' contemporaneous altercation with a

---

convict the Defendants on the firearms offenses in Counts Three and Four because these counts required the Government to prove beyond a reasonable doubt that the Defendants committed the murder conspiracy

in violation of VCAR, as charged in Count One. *See Polanco,* 145 F.3d at 540 ("derivative" conviction of violating § 924(c) reversed where VCAR conviction reversed on insufficiency of evidence ground).

rival gang was sufficient to permit a rational juror to conclude that the Netas constituted an entity engaged in racketeering during the time period relevant to the indictment.

In *United States v. Desena*, 287 F.3d 170 (2d Cir.2002)—a VCAR case where the defendant unsuccessfully challenged the sufficiency of the evidence that he engaged in the racketeering act of attempted assault—we had the opportunity to review the elements of an "attempt" crime set forth in the New York Penal Law. That statute imposes criminal liability for an attempted crime when "with intent to commit a crime, [the defendant] engages in conduct which tends to effect the commission of such crime." N.Y. Penal Law § 110.00. As we explained in *Desena*, New York's courts "require[ ] that the [G]overnment prove the defendant engaged in conduct that came *dangerously near* commission of the completed crime." 287 F.3d at 178 (emphasis added and internal quotation marks omitted) (quoting *People v. Kassebaum*, 95 N.Y.2d 611, 618, 721 N.Y.S.2d 866, 744 N.E.2d 694 (2001)). "To satisfy the 'dangerously near' standard, the defendant must have carried the project forward to within 'dangerous proximity' of the intended crime, though he need not take the final step to effectuate that crime." *Id.* (citing *People v. Bracey*, 41 N.Y.2d 296, 300, 392 N.Y.S.2d 412, 360 N.E.2d 1094 (1977); *People v. Fair*, 269 A.D.2d 91, 94, 711 N.Y.S.2d 196 (3d Dep't 2000)). "The rationale behind the 'dangerously near' or 'dangerous proximity' standard is that it imposes criminal liability only in situations where the defendant's conduct caused 'a sufficient risk of harm to be treated as a crime in itself.'" *Id.* (quoting *Bracey*, 41 N.Y.2d at 299, 392 N.Y.S.2d 412, 360 N.E.2d 1094).

In the context of attempted murder prosecutions factually analogous to the case at bar, New York courts have consistently held that, to survive a sufficiency-of-the-evidence challenge, the Government must establish that the defendant pointed a weapon at a victim and was about to kill him with it. For example, in *People v. Putnam*, 130 A.D.2d 52, 55–56, 518 N.Y.S.2d 239 (3d Dep't 1987), the Appellate Division found insufficient evidence to support an attempted murder conviction where the only acts committed by the defendant were an agreement between defendant and a "hit man" for the murder to occur during a certain weekend and for the defendant to supply the hit man with a knife to be used as the murder weapon together with the hit man's requested fee for committing the murder. Likewise, in *People v. Mendez*, 197 A.D.2d 485, 485, 603 N.Y.S.2d 44 (1st Dep't 1993) (mem.), the Appellate Division vacated the defendant's attempted murder conviction where the defendant pointed a revolver at the victim's midsection from a distance but did not have his finger on the trigger. And, in *People v. Chandler*, 250 A.D.2d 410, 411, 673 N.Y.S.2d 100 (1st Dep't 1998) (mem.), the Appellate Division again vacated a defendant's attempted murder conviction where the defendant "momentarily pointed a loaded semiautomatic pistol at the chest of a police officer from a distance of approximately 25 feet[, but] there [was] no proof that [he] had his finger on the trigger." (internal quotation marks omitted)

█ In light of the foregoing, there was insufficient evidence to support a finding by the jury that the Netas attempted to murder Santiago in August or September of 1994, at Pimentel's direction. That evidence, when viewed in the light most favorable to the Government, *see Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Dhinsa*, 243 F.3d at 648–49, established only that (1) Garcia was armed when he spent an evening in the vicinity of a park, which

Santiago was known to frequent, looking for him so he could shoot and kill him; and (2) Garcia abandoned his attempt to kill Santiago after he failed to locate him. These activities fall far short of the "dangerously near"/"dangerous proximity" bar set forth in New York's attempted murder case law. Accordingly, the attempted murder of Santiago cannot serve as the requisite racketeering act to support the Defendants' convictions.

■ Nevertheless, the Government did present sufficient evidence for a rational jury to have found that the Netas engaged in attempted murder. In particular, Garcia testified that, in September or October of 1994, following an earlier altercation between the Netas and members of a rival gang, the Papichulos, a Neta named Caveman chased down members of the Papichulos with a machine gun in hand and proceeded to beckon them out from hiding. When the Papichulos' leader came out and fired his shotgun at Caveman, Caveman immediately opened fire with his semi-automatic weapon.

Because Garcia testified that this episode occurred as part of a larger altercation between the Netas and the Papichulos, a rational juror certainly could have concluded that Caveman took these actions on behalf of the Netas. Moreover, although one could argue that Cavemen ultimately fired at the rival gang members in self-defense, the fact that, before the shooting occurred, he chased after them with a semi-automatic weapon and called them out from hiding provides more than sufficient evidence for a rational juror to have concluded that Caveman would have

fired upon the Papichulos even if they had not fired first.  .

Accordingly, the Government provided sufficient evidence for a rational juror to have concluded that the Netas constituted an entity engaged in attempted murder during the relevant time period to serve as the requisite act of racketeering to support the Defendants' convictions. *See* 18 U.S.C. § 1961 (defining racketeering activity to include "any act or threat involving murder ... chargeable under State law and punishable by imprisonment for more than one year").

2. *Murder*

■ Turning to racketeering activity of murder, we likewise conclude that the evidence was sufficient for a rational jury to find that the Netas, through its members and associates, was engaged in racketeering during the time period relevant to the indictment. We find that the Government presented sufficient evidence to attribute Garcia's murder of DeJesus to the Netas to serve as the requisite act of racketeering to support the Defendants' convictions, and we also find that evidence of four other murders claimed by Pimentel to be the responsibility of the Netas independently would permit a jury to conclude that the Netas was actively engaged in racketeering activity of murder during the time period relevant to the indictment.

Other than Santiago's murder,[6] the primary evidence submitted concerning a murder committed during the period covered by the indictment, was Garcia's March 1995 murder of DeJesus in Lancaster, Pennsylvania. The parties do not dispute that Garcia committed a murder, as

---

**6.** Without citing to any case law, the Government argues for the first time on appeal that the substantive crime of violence alleged in the indictment—i.e., the murder of Santiago—can also satisfy the racketeering act ele-

ment in a VCAR prosecution. Because the Government déclined to make this argument to the jury, we will not consider it for the first time on appeal.

that term is defined by Pennsylvania law. As discussed above, although Garcia initially claimed that he killed DeJesus in self-defense, that claim was rejected by the Pennsylvania jury that convicted him for murder, and in any event, Garcia admitted at the Defendants' trial to murdering DeJesus. The argument pressed by the Defendants in their appeal is that there was insufficient evidence to show that DeJesus' murder was committed by, or on behalf of, the Netas. Rather, they assert, the evidence established that Garcia killed DeJesus for his own personal reasons and was acting on his own and not on behalf of the Netas.

Viewing the evidence in the light most favorable to the Government, we conclude that a rational jury could have found beyond a reasonable doubt that Garcia was acting by, or on behalf of, the Netas when he killed DeJesus. As detailed above, the evidence permitted a finding that the murder of DeJesus was connected to the purposes of the Netas because Garcia testified that DeJesus was "interfering with the job" that brought Garcia to Pennsylvania on behalf of the Netas. While the Defendants contend that Garcia acted out of personal motivation in response to disparaging remarks DeJesus made about him, we conclude that a rational jury could reject that theory and instead find, based on the killing of DeJesus by Garcia, that the Netas engaged in racketeering activity of murder.

But even if the jury did not credit this evidence in favor of the prosecution, the Government presented other evidence sufficient for a rational jury to have found that the Netas engaged in murder. At the Defendants' trial, Special Agent Jeffrey Ringel of the Federal Bureau of Investigation testified that, following Pimentel's arrest, "[w]hen asked if she was aware of the violence connected with the Netas, [Pimen-

tel] claimed that they used to beat up members . . . and were responsible for the murder of [four individuals]." Although Pimentel did not expressly state that these murders occurred during the time period covered by the indictment, they demonstrate that the Netas engaged in murder in the past and as part of their basic modus operandi. Moreover, nothing in the record indicates that the Netas changed their policy with respect to murder prior to the time period specified in the indictment. To the contrary, Garcia testified that, during the relevant time period, the Netas' punishment for the commission of rape or for being a "snitch" was execution. Based on this evidence, a rational jury could have determined that, during the period of time covered in the indictment, the Netas constituted an entity that engaged in murder to serve as the requisite act of racketeering to support the Defendants' convictions. *See* 18 U.S.C. § 1961 (defining "racketeering act" to include "any act or threat involving murder . . . chargeable under State law and punishable by imprisonment for more than one year").

### 3. *Drug Trafficking*

■ Finally, with respect to the racketeering activity of drug trafficking, in violation of 21 U.S.C. § 846, we again conclude that the evidence was sufficient for a rational jury to find that the Netas was an enterprise engaged in racketeering in the time period relevant to the indictment. Section 846 proscribes attempts or conspiracies to commit the substantive narcotics offenses contained in the federal Controlled Substances Act, which criminalizes, among other things, the "manufacture, distribut[ion], or dispens[ing]," or the "possess[ion] with intent to manufacture, distribute, or dispense" of a controlled substance, 21 U.S.C. § 841(a)(1). Although the purported official policy of the Netas was to prohibit the use and sale of

narcotics, we conclude that, in light of the other evidence presented, a rational jury could find that such policy was a sham and that the Netas engaged in drug trafficking sufficient to serve as the requisite racketeering act to support the Defendants' convictions.

In *Feliciano*, we considered a similar sufficiency-of-the-evidence challenge in a VCAR prosecution where the racketeering act alleged was drug trafficking and the criminal enterprise was a street gang. There, we affirmed the jury's conviction where the evidence consisted of, inter alia: (1) testimony of undercover purchases of cocaine and heroin from members of the gang; and (2) testimony from a former gang member that gang members "were required to pay a portion of their earnings, including earnings from drug sales, into the chapter's 'kitty,' maintained by the chapter's 'Treasurer.'" *Feliciano*, 223 F.3d at 114. Based on this evidence, we concluded that the Government had "adduced abundant evidence of drug trafficking by members of" the gang, in violation of 21 U.S.C. § 841, and that "such evidence was more than sufficient to show that [the gang] engaged in racketeering activities." *Id.*

Although here the quantum of evidence falls short of what was presented in *Feliciano*, the evidence nevertheless was sufficient for a rational jury to conclude that the Netas, as an enterprise, engaged in drug trafficking. We recognize that certain evidence showed that the Netas had a purported official policy prohibiting the use and sale of narcotics, that individual members of the Netas allegedly had been punished for violating the policy, and that Pimentel claimed to be an outspoken proponent of the policy. But that evidence was countered by testimony that several individual Netas members used and sold narcotics, that the leadership of the gang did not make substantial efforts to stop these activities, and that the Netas responded as a group to threats from other gangs over "drug spots" and "territory." Consequently, upon viewing the evidence in the light most favorable to the Government, we conclude that a rational jury could have found that the Netas, through its members and associates, engaged in drug trafficking and, indeed, that the purported official policy of the Netas was a sham. Our decision to affirm the jury's verdict is informed by our recognition above that groups like the Netas can act only through their individual members and that determining whether a group like the Netas engaged in racketeering activity requires a fact-based investigation into the ways in which the individual members of the Netas acted for the group and/or in concert with other members.

Accordingly, we hold that the evidence concerning drug trafficking was sufficient to have permitted a properly instructed jury to find beyond a reasonable doubt that the Netas engaged in the requisite racketeering act to support the Defendants' convictions. *See* 18 U.S.C. § 1961 (defining "racketeering act" to include dealing in a controlled substance identified by the Controlled Substances Act).

### II. *Jury Instructions*

#### A. *Standard of Review*

██ "The propriety of a jury instruction is a question of law that we review *de novo*." *United States v. George*, 266 F.3d 52, 58 (2d Cir.2001). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Walsh*, 194 F.3d 37, 52 (2d Cir.1999) (internal quotation marks omitted). Even if a jury instruction is erroneous, however, we will vacate a criminal conviction "only if the error was prejudi-

cial and not simply harmless." *George,* 266 F.3d at 58. Such error is harmless only if "it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *Id.* at 61 (quoting *Neder v. United States,* 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). "In making this assessment, we consider '(a) whether there was sufficient evidence to permit a jury to find in favor of the defendant on the omitted element, and, if there was, (b) whether the jury would nonetheless have returned the same verdict of guilty.'" *Id.* (quoting *United States v. Jackson,* 196 F.3d 383, 386 (2d Cir.1999)).

B. *The District Court's Decision Not to Define the Elements of the Racketeering Acts in the Jury Charge*

As discussed above, in addition to finding that the Defendants were involved in the murder of Santiago, the jury had to find that the Netas engaged in (1) trafficking in controlled substances that would constitute substantive narcotics offenses, in violation of 21 U.S.C. § 846; or (2) acts involving murder or attempted murder, in violation of New York or Pennsylvania law. As we explained in *United States v. Carrillo,* 229 F.3d 177, 186 (2d Cir.2000), VCAR and RICO "seem to require of a predicate act based on state law that the act include the essential elements of the state crime."

■■■ In charging the jury with respect to the racketeering element, the District Court stated that the Government first had to establish that "during the time period relevant to this count, an enterprise existed which was engaged in racketeering activity affecting interstate commerce." The parties do not dispute that the District Court failed to define the elements of the underlying racketeering activities charged in the indictment, i.e., drug trafficking, murder, and attempted murder. They dis-

agree, however, on what elaboration, if any, our precedents require district judges to make concerning these activities when instructing a jury in a VCAR or RICO prosecution.

In *United States v. Bagaric,* 706 F.2d 42 (2d Cir.1983), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), we rejected the defendants' argument that the district judge did not adequately instruct the jury on the elements of the state-law offenses charged as the racketeering act. Specifically, we held that "[u]nder RICO ... state offenses are included by generic designation," and that "references to state law serve [merely] a definitional purpose, to identify generally the kind of activity made illegal by federal statute." *Id.* at 62 (internal quotation marks and citations omitted). "We therefore concluded that the district [judge] was not required to charge the jury on the state law elements of the offenses constituting the predicate racketeering acts of murder, arson, and extortion, and that '[a]ccurate generic definitions of the crimes charged were sufficient.'" *Carrillo,* 229 F.3d at 182 (quoting *Bagaric,* 706 F.2d at 63).

Since *Bagaric* was decided, we have on more than one occasion cautioned the Government and district judges within this Circuit against adhering to the bare bones generic instructions concerning the racketeering act elements that were found to be sufficient there. For example, in *Carrillo,* the defendant appealed his VCAR and RICO convictions for committing murders in aid of racketeering, arguing that the district judge's jury instructions did not adequately define the state-law elements of the underlying racketeering acts. The Government, relying on *Bagaric,* argued that district judges "need not charge each element of the state law crimes constitut-

ing the predicate racketeering acts. Rather, generic definitions of the crimes suffice." *Carrillo,* 229 F.3d at 182. While we agreed that *Bagaric* "support[ed] the [G]overnment's position," we expressed "doubts [about] whether *Bagaric*'s principle [could] be applied as a practical matter in all circumstances." *Id.* at 183. In particular, we explained:

> If the conduct proved at trial did not satisfy the elements of the offense as defined by state law, a jury could not find that the defendant had committed the state law offense charged as a predicate act of racketeering. Likewise, even assuming evidence from which a jury *could* find a violation of state law, if the defendant's acts as found by the jury did not include all the essential elements of the state law offense, by definition, no state offense would have been found. It is difficult to see ... how the defendant could be properly convicted if the conduct found by the jury did not include all the elements of the state offense since RICO requires that the defendant have committed predicate acts "chargeable under state law." If a district judge failed to charge a jury on the state law elements of the crime constituting a racketeering act, neither we nor the district judge could know what were the factual determinations on which the jury based its verdict. Thus, we would be unable to determine what the jury decided the defendant actually did, and whether, under the jury's findings, the defendant committed the state law offense charged as a racketeering act.

*Id.* at 183–84 (footnote omitted).

Although we affirmed the conviction in *Carrillo,* we provided examples of when a district judge's failure to define the state-law crimes constituting the charged racketeering acts could and could not affect the outcome of a RICO or VCAR trial. For example, we found that the failure to define the predicate act "would be of small practical consequence" in a case where "a defendant [was] charged with robbery as a predicate act [and] where the undisputed evidence show[ed that] the victim was robbed by a stranger at gunpoint and the only issue in question [was] whether the defendant was the robber." *Id.* at 184. Indeed, there "would be little or no danger that the jury might have found the defendant guilty based on a faulty understanding of what robbery consist[ed] of." *Id.*

We identified other cases, however, in which "confusion and unfairness [could] arise from failure to charge the elements of the state law crimes constituting racketeering acts." *Id.* For example, we posited a hypothetical where a defendant is charged with a RICO violation based on a predicate racketeering act of murder and where "the evidence includes testimony that could support the requisite state of mind," but "the defendant contests it and asserts [that] he acted in self-defense." *Id.* If the jury were "instructed simply to find whether the defendant committed the offense of 'murder,'" but "not instructed as to the requisite state of mind or the law respecting self-defense," and "the jury [subsequently found] that the defendant committed the predicate act of murder and [was] guilty on the RICO charge," there "would be no way for the reviewing court to know whether the jury had found facts constituting murder," and "[a]ffirming such a conviction would be seriously problematic because the defendant's actions, as found by the jury, might not constitute murder." *Id.* Thus, an "appellate court would have no way of knowing what the jury found the defendant's state of mind to be." *Id.*

With the hypotheticals identified in *Carrillo* in mind, we proceeded to read *Bagaric* as establishing that, "as a theoretical

matter at least, a district judge may, within the judge's discretion, charge a predicate RICO offense by a generic description rather than giving the jury the elements in full," although we thought that charging the elements in full was the "best practice." *Id.* at 185. But we cautioned that it did not follow from *Bagaric* that such a generic definition would provide the jury with sufficient instruction and the defendant with adequate protection in all circumstances. *Id.* Not to put too fine a point on the matter, we warned that *Bagaric* did "not guarantee that such practice might not be found an abuse of discretion if, *[in] the circumstances of the particular case,* it risks prejudice to the defendant" and that "[d]eclining to instruct the jury on the elements of state law offenses charged as predicate acts under RICO, [VCAR], and similar statutes, [could] prejudice the defendant." *Id.* (emphasis added). Indeed, because, "[n]otwithstanding *Bagaric*'s theoretical approval [of the generic approach], the practice risk[ed] reversal on appeal," we advised that the "safer course [was] for trial judges to instruct the jury on the elements of the predicate offenses." *Id.* Moreover, we observed that, for all these reasons, "in spite of *Bagaric*, district judges conventionally instruct[ed] juries on the elements of the state law offenses charged as predicate acts." *Id.* at 184.[7]

More recently, in *Feliciano*, the district judge—like the District Court here—failed to define the elements of drug trafficking when instructing the jury about the racketeering act element of VCAR. As noted above, we found the evidence supporting the drug trafficking by the enterprise in *Feliciano* to be overwhelming, and thus we

found any error in the jury instructions with respect to this issue to be harmless. 223 F.3d at 115. Moreover, we also noted that, because defense counsel had not objected to this deficiency in the jury charge, our review of the instruction was limited to plain error. *Id.* at 114–15. Nevertheless, we characterized the defendant's argument that the district judge committed plain error by failing to instruct on the elements of §§ 841(a)(1) and 846 as one that "may have some force." *Id.* at 115.

Taking *Carrillo* as our guide, we conclude, in the circumstances presented here, that the District Court's failure to define the racketeering acts alleged in the indictment does not require a new trial, given the quality and quantity of the evidence of those racketeering acts. As discussed above, there was legally sufficient evidence that the Netas engaged in the racketeering acts alleged in the indictment. In particular, the Defendants did not contest at trial that Garcia murdered DeJesus (e.g., the Defendants did not assert that Garcia acted in self defense) or that Caveman attempted to murder rival gang members. Thus, the District Court's failure to define the elements of murder and attempted murder was of little moment, given that the jury's only task with respect to these racketeering acts was to decide whether they were committed on behalf of the Netas. A jury charge containing the definitions of murder and attempted murder would not have assisted the jury in this task.

■ We now turn to the District Court's decision not to define drug trafficking in its charge to the jury. In hindsight, we believe it would have been wiser for the District Court to provide the jury with a definition of drug trafficking after

---

**7.** Indeed, that district judges appear regularly to engage in this practice seriously undermines the argument made by the Government both at trial and on appeal that including the

elements of charged racketeering acts in the jury charge will be too cumbersome and will only confuse the jury.

receiving the jury's note asking what this term meant. Nevertheless, we have concluded that (1) the evidence was legally sufficient to support the murder and attempted murder racketeering acts alleged in the indictment, and (2) the District Court did not err in declining to define those offenses with particularity. Consequently, in the absence of a special verdict indicating which racketeering act(s) the jury found had been committed, the District Court's decision not to define the elements of drug trafficking cannot provide a basis for vacating the Defendants' convictions. *See Griffin,* 502 U.S. at 49–50, 112 S.Ct. 466 *Masotto,* 73 F.3d at 1241.

In affirming these convictions, we do not condone the District Court's decision not to include in its jury charge the definition of the racketeering acts charged in the indictment. Indeed, as in *Carrillo* and *Feliciano,* we again caution the Government and the district courts in this Circuit that the preferred practice in VCAR and RICO cases is to include those definitions when charging the jury, and not doing so risks vacatur of the convictions on appeal. Moreover, we also strongly encourage the use of special verdict forms in cases alleging multiple racketeering acts to facilitate appellate review.[8]

### CONCLUSION

For the foregoing reasons, we affirm the judgments of conviction.

8. We also express our displeasure with certain actions taken by the Government (apparently for tactical reasons). Those actions include the Government's: (1) failure to allege with specificity in the indictment the racketeering acts charged; (2) opposition to the Defendants' request for a bill of particulars concerning the charged racketeering acts; (3) failure throughout the trial to present a coherent theory to the jury concerning the racketeering activities of the Netas; (4) objection to the Defendants' request that the District Court define the elements of the charged racketeering acts; and (5) failure to join the Defendants in crafting a meaningful response to the jury's request for a definition of drug trafficking.