**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee,*<br><br>v.<br><br>LELAND DEVINE BANKS,<br>*Defendant-Appellant.* | No. 05-10053<br><br>D.C. No.<br>CR-04-00052-KJD<br><br>ORDER<br>AMENDING<br>OPINION AND<br>GRANTING IN<br>PART<br>APPELLANT'S<br>MOTION FOR<br>CLARIFICATION<br>OR, IN THE<br>ALTERNATIVE,<br>FOR REHEARING<br>AND AMENDED<br>OPINION |

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted
October 18, 2006—San Francisco, California

Filed October 25, 2007
Amended January 29, 2008

Before: J. Clifford Wallace, Andrew J. Kleinfeld, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

1349

## COUNSEL

Richard F. Cornell, Law Office of Richard F. Cornell, Reno, Nevada, for appellant Leland Devine Banks.

Russell E. Marsh, Assistant United States Attorney, United States Attorney's Office, Las Vegas, Nevada, for the appellee.

## ORDER

The opinion, filed on October 25, 2007, slip opinion 14183, and appearing at 506 F.3d 756 (9th Cir. 2007), is amended as follows:

1. At slip op. 14187, second full paragraph; 506 F.3d at 759, second full paragraph, replace:

"We have jurisdiction under 28 U.S.C. § 1291, and we REVERSE his VICAR convictions and sentences on the basis that the district court's instructions to the jury were erroneous. We AFFIRM the district court in all other respects."

with

"We have jurisdiction under 28 U.S.C. § 1291, and we REVERSE his VICAR convictions and sentences on the basis that the district court's instructions to the jury were erroneous.

We REVERSE his convictions for use of a firearm in furtherance of a crime of violence because his VICAR convictions were essential elements of those crimes. We AFFIRM the district court in all other respects."

2.    At slip op. 14213, second full paragraph; 506 F.3d at 773, fourth full paragraph, replace:

"Because the district court erred by instructing the jury that it could convict Banks under the VICAR statute if it found that any element of his motivation, no matter how incidental, in assaulting Gilmore was to maintain his membership in the Rolling 60s, we REVERSE his conviction and sentence as to the two VICAR counts and REMAND for further proceedings. We AFFIRM the district court in all other respects."

with

"Because the district court erred by instructing the jury that it could convict Banks under the VICAR statute if it found that any element of his motivation, no matter how incidental, in assaulting Gilmore was to maintain his membership in the Rolling 60s, we REVERSE his conviction and sentence as to the two VICAR counts and REVERSE his conviction and sentence as to the two use of firearm counts, which were predicated on his VICAR convictions. *See United States v. Ritter*, 989 F.2d 318, 322 (9th Cir. 1993). We REMAND for further proceedings and AFFIRM the district court in all other respects."

With these amendments, the panel has voted to grant in part appellant's Motion for Clarification or, in the alternative, for Rehearing. Appellant's Motion for Clarification or, in the alternative, for Rehearing has been considered, and it is GRANTED IN PART. No further petitions for rehearing may be filed.

## OPINION

BYBEE, Circuit Judge:

Leland Devine Banks was convicted of violence in aid of a racketeering enterprise ("VICAR"), use of a firearm in a crime of violence, and possession of a firearm by a convicted felon. He was sentenced to a total of 450 months in prison. Banks appeals his conviction and sentence, raising five alleged errors by the district court. First, he argues that the district court gave erroneous instructions for the VICAR counts. Second, he argues that the evidence was insufficient to convict him on the VICAR and use of firearm counts. Third, he argues that the district court erred in giving a "de facto *Allen* charge." Fourth, he argues that the district court erred in admitting into evidence the underlying facts of a prior felony conviction. Finally, he argues that cumulative error produced a miscarriage of justice.

We have jurisdiction under 28 U.S.C. § 1291, and we REVERSE his VICAR convictions and sentences on the basis that the district court's instructions to the jury were erroneous. We REVERSE his convictions for use of a firearm in furtherance of a crime of violence because his VICAR convictions were essential elements of those crimes. We AFFIRM the district court in all other respects.

I

### A.  *Factual Background*

Leland Banks had issues with Kenny Gilmore. For starters, they belonged to rival Crips gangs in Las Vegas: Banks was a member of the Rolling 60s, and Gilmore belonged to the Valley View Crips. But Banks also had, or thought he had, a personal score to settle with Gilmore. Banks had once overheard Gilmore's girlfriend use the word "crab," apparently one of the most disrespectful names a Crips member can be

called, and thought she was referring to him. Banks told Gilmore to "check his bitch," but Gilmore only retorted, "my baby's mama ain't no bitch."[1] Banks, perhaps hoping to restore his honor, challenged Gilmore to a fight, but Gilmore declined.

Banks then initiated what he described as an "ongoing battle" with Gilmore. Banks launched the first disastrous salvo a couple of weeks after the perceived insult. Banks, high on PCP, saw Gilmore playing dice. Banks pulled his gun, but somebody, apparently a friend of Gilmore's, approached Banks from behind and pistol-whipped him, sending him into a coma.

Banks, however, was not easily deterred. Shortly after being discharged from the hospital, Banks tried shooting Gilmore again but missed. Banks then sought reinforcements, enlisting his "little homies" to beat and shoot at Gilmore. This rather one-sided battle finally culminated on January 6, 2004, when Banks saw Gilmore in the neighborhood, grabbed his broken-stocked .22 caliber rifle, and climbed to the rooftop of the Kimberly Place Apartments, which offered him a clear line of sight to Gilmore, who was standing across the street in front of a 7-Eleven. Banks fired several shots at Gilmore but again missed his target. Gilmore and the store clerk fled into the store, where they stayed hidden with several customers until the police arrived.

Banks remained on the rooftop where he was discovered by Officer Garness of the Las Vegas Metropolitan Police Department ("LVMPD"), who was flying overhead in a police helicopter. The police ordered Banks off the roof; after placing something near the air conditioner, he complied and was arrested. The police found the .22 caliber rifle hidden on the roof near the air conditioner.

---

[1] As it happens, Gilmore had good reason not to comply with Banks's order—Gilmore's girlfriend had in fact been referring to *Gilmore* when she used the word "crab."

*B.   Trial*

Banks was ultimately tried on five counts: (1) attempted murder in violation of 18 U.S.C. § 1959(a)(5) (violent crime in aid of racketeering (VICAR)); (2) use of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1); (3) assault with a dangerous weapon in violation of 18 U.S.C. § 1959(a)(3) (VICAR); (4) another count involving use of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1); and (5) being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) & (a)(2).

Prior to trial, Banks moved to sever the felon-in-possession count, but the prosecution offered to stipulate to the fact of the prior felony conviction, and the district court therefore denied the motion as moot. Also prior to trial, the government gave notice that it intended to present evidence of Banks's prior criminal acts for three reasons: (1) to establish his gang membership; (2) to show his motive for attempting to kill Gilmore; and (3) to establish that Banks's gang was a criminal enterprise for purposes of the VICAR statute. Banks did not move to preclude any of this evidence.

Trial began in October 2004. One of the prior criminal acts introduced by the government was the conduct that resulted in Banks's prior felony conviction: his stabbing of another individual, a man identified in the record only as Mr. Lindsey, in response to a perceived slight. Banks objected to introduction of this evidence but provided no basis for his objection other than that he had already stipulated to the fact of the prior conviction. After admonishing the prosecution to "stay away from the conviction," the district court admitted the evidence of the underlying act.

Jury deliberations began two days later. After some difficulty in reaching a verdict, followed by additional instructions from the court (described in greater detail below), the jury

convicted Banks on all five counts. The district court sentenced Banks to a total of 450 months in prison: 120 months as to count one (the first VICAR count), 210 months as to count three (the second VICAR count), and 120 months as to count five (the felon-in-possession charge), all to run concurrently; 120 months each on counts two and four (the two use-of-a-firearm charges), running concurrently to each other, but consecutively to the sentences on counts one, three, and five; and 120 months as a criminal gang enhancement, to run consecutively to the other sentences. Banks timely filed this appeal.

## II

On appeal, Banks raises five challenges to his convictions and sentence. Of these, we reject all but the first.

### A.   *VICAR Jury Instruction*

**[1]** The VICAR statute provides that "[w]hoever, . . . *for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity*, murders [or] . . . assaults with a dangerous weapon . . . in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished." 18 U.S.C. § 1959(a) (emphasis added). In our prior decisions we have identified four elements required for a conviction under this statute: "(1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendant[ ] committed a violent crime; and (4) that [the defendant] acted for the purpose of promoting [his] position in a racketeering enterprise." *United States v. Bracy*, 67 F.3d 1421, 1429 (9th Cir. 1995); *see also United States v. Fernandez*, 388 F.3d 1199, 1220 (9th Cir. 2004). Banks contends that the district court's instructions to the jury on the VICAR counts misstated the purpose element of the charged offense. We review the district court's instructions de novo. *See United States v. Phillips*, 367 F.3d 846, 854 (9th Cir. 2004).

The district court instructed the jury that the purpose element could be satisfied if "*at least one of* the defendant's purposes in committing [the violent crime] was to gain entrance or maintain or increase his position in the enterprise, the Rolling 60s Crips." Thus, the Government need not "prove that this motive was the sole purpose, or even the primary purpose of the Defendant in committing the charged crime"; rather, the jury "need only find that it was *one* of his purposes." The court further instructed the jury that the fourth element could be satisfied "if the Defendant committed the charged violent crime *at least in part* because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership."

Banks objects that these instructions misstate the law because they permit the jury to convict him of a VICAR violation even if his primary motive was personal revenge and he was only incidentally motivated by the desire to regain the respect of fellow gang members. This, he contends, plainly contravenes the language of the statute, which requires that the violent act be committed "for *the* purpose of . . . maintaining or increasing [his] position" in the Rolling 60s. 18 U.S.C. § 1959(a) (emphasis added).

**[2]** This question—whether VICAR requires the defendant to have committed the violent act for the primary or sole purpose of maintaining or enhancing his purpose in the criminal enterprise, or whether it is sufficient that he was motivated only in part by such purpose—is one of first impression in this circuit. However, at least five of our sister circuits have addressed this question, and all of them have concluded that VICAR's purpose element is satisfied even if the maintenance or enhancement of his position in the criminal enterprise was not the defendant's sole or principal purpose. In the first of these cases, the Second Circuit "reject[ed] any suggestion that the 'for the purpose of' element requires the government to prove that maintaining or increasing position in the RICO enterprise was the defendant's sole or principal motive."

*United States v. Concepcion*, 983 F.2d. 369, 381 (2d Cir. 1992). Instead, it held that § 1959(a) simply required that the defendant's "general purpose in [committing an act of violence] was to maintain or increase his position in the enterprise." *Id*. Thus, the purpose element is met if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Pimentel*, 346 F.3d 285, 295-96 (2d Cir. 2003) (quoting *Concepcion*, 983 F.2d at 381). *See also United States v. Smith*, 413 F.3d 1253, 1277-78 (10th Cir. 2005) (adopting Second Circuit's interpretation of purpose requirement); *United States v. Tse*, 135 F.3d 200, 206 (1st Cir. 1998) (agreeing with Second and Fourth Circuits that government need not prove "that the crime was solely motivated by a desire to maintain or increase a particular position within the enterprise"); *United States v. Wilson*, 116 F.3d 1066, 1078 (5th Cir. 1997) (stating that "[s]elf-promotion need not be the defendant's sole or primary concern" so long as acts are committed "as an integral aspect of membership in such enterprises") (internal quotation marks omitted), *vacated in part by United States v. Wilson*, 1997 U.S. App. LEXIS 29843 (5th Cir. September 9, 1997) (stating that panel opinion as to all but one defendant's conviction remained intact); *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994) ("violent crimes committed as an integral aspect of membership in such enterprises") (internal quotation marks omitted).

Banks argues that we should adopt a narrower construction of VICAR's purpose element than that adopted by our sister circuits. In so arguing, he points to the text of the statute, the principle that criminal statutes should be construed narrowly, and the rule of lenity. Our reading of the statute, however, convinces us that our sister circuits have correctly interpreted the purpose element.

We start, as does Banks, with the language of the statute. *Cf. Navajo Nation v. HHS*, 325 F.3d 1133, 1136 (9th Cir.

2003) ("We begin, as always, with the language of the statute" (internal quotations omitted).). As noted above, VICAR punishes certain violent acts committed by a defendant "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity . . . ." 18 U.S.C. § 1959(a). Banks places great emphasis on the phrase "*the* purpose," insisting that we must interpret the definite article as expressing Congress's intention to criminalize only those acts where the defendant acted primarily—or even exclusively—for a gang-related purpose. Banks argues that Congress's use of the definite article is conclusive: If Congress had intended for VICAR to apply to defendants who did not act with the sole purpose of entering or maintaining their status within a criminal enterprise, it would have used the indefinite article and the statute would read "[w]hoever, . . . for *a* purpose of gaining entrance to or maintaining or increasing position in an enterprise . . . ."

**[3]** Neither the "text, context, [nor] purpose" of this provision support this reading. *United States v. Hughes*, 282 F.3d 1228, 1231 (9th Cir. 2002). First, an unforced, natural reading of the plain text provides no support for the interpretation Banks proposes. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (stating that courts look to "ordinary or natural meaning" (internal quotations omitted)). The provision itself contains no reference to the defendant's "sole" or "exclusive" or "primary" purpose. *See Concepcion*, 983 F.2d at 381 (noting that nothing in the text of the statute limited its application to cases where the defendant's sole or primary purpose was to maintain gang membership). Moreover, the language Banks proposes that Congress could have used if it had intended VICAR to apply to defendants acting from multiple motives —"for *a* purpose"—does violence to ordinary usage, and the awkwardness of his proposed revision demonstrates the implausibility of his argument. A more natural reading would recognize that "[i]n ordinary usage, doing X 'for the purpose of' Y does not imply that Y is the exclusive purpose." *Hughes*, 282 F.3d at 1231. Indeed, if Congress had meant for

VICAR to apply only to defendants acting solely (or primarily) for the purpose of entering a gang or maintaining or enhancing their position within it, it could easily—and much more naturally—have adopted language referring to "the *sole* (or exclusive, or primary) purpose" of the defendant. In sum, "the use of the word 'the' does not bear the weight that [Banks] gives it."[2] *Id.*

The above analysis alone would justify our rejection of Banks's interpretation, but the context and purpose of the VICAR statute also confirms this reading. *See Hughes*, 282 F.3d at 1231 (looking to context and purpose of provision in addition to plain text); *United States v. Davidson*, 246 F.3d 1240, 1246 (9th Cir. 2001) (stating that we "consider[ ] not

---

[2]Cases interpreting the Mann Act as it existed prior to 1986 support this reading. In its pre-1986 incarnation, the Mann Act prohibited the knowing transport in interstate commerce of "any woman or girl *for the purpose of* prostitution or debauchery, or for any other immoral purpose." 18 U.S.C. § 2421 (emphasis added). We held on at least two occasions that it was not necessary that the defendant act solely, or even primarily, for the proscribed immoral purpose. *See United States v. Fox*, 425 F.2d 996, 999 (9th Cir. 1970) (upholding jury instructions that required the jury to find only that the immoral purpose was one of the defendant's dominant purposes and that specifically stated it need not be the defendant's sole or single purpose); *Bush v. United States*, 267 F.2d 483, 485 (9th Cir. 1959) ("It is not necessary that such intent be the sole and single purpose of the transportation, if such purpose and intent was one of the reasons for the transportation."). Other circuits interpreted the Act's purpose element similarly, consistently holding that the Act did not require "that the sole and single purpose of the transportation of a female in interstate commerce was such immoral practices." *Dunn v. United States*, 190 F.2d 496, 497 (10th Cir. 1951); *see also Forrest v. United States*, 363 F.2d 348, 349-50 (5th Cir. 1966); *United States v. Salter*, 346 F.2d 509, 511 (6th Cir. 1965) (holding that Mann Act requires only that the defendant's immoral purpose is "only one of the dominant purposes"); *Dingess v. United States*, 315 F.2d 238, 240 n.2 (4th Cir. 1963) (stating that a conviction under the Mann Act might be proper even if the defendant had acted with "a concurrent purpose, [such as] enjoyment of scenery, a visit with a relative or investigation of legitimate employment opportunities"). Banks has pointed to nothing in the text of the VICAR statute that demands a different interpretation of its very similar purpose element.

only the bare meaning of the word but also its placement and purpose in the statutory scheme" (internal quotation marks omitted)). As the Second Circuit noted in *Concepcion*, Congress enacted VICAR to complement RICO, and it intended VICAR, like RICO, "to 'be liberally construed to effectuate its remedial purposes.' " *Concepcion*, 983 F.2d at 380-81 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985)); *see also Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc) (noting that both Congress and the Supreme Court have instructed that RICO be liberally construed and therefore declining to construe the statute narrowly). Banks objects that a liberal construction of VICAR is inappropriate because it is penal and not remedial in nature. Although we agree that criminal statutes should generally be construed narrowly, this principle does not operate as a flat prohibition on statutes that are drafted to apply to a broad range of conduct. We therefore see no reason to apply this principle where the provision is part of a larger remedial framework. Within this remedial context, we do not believe that Congress intended for courts to busy themselves with "rank[ing] the reasons that a defendant had for committing the offense." *Hughes*, 282 F.3d at 1231.

In fact, ranking the defendant's reasons in such a fashion would run directly contrary to VICAR's purposes. In addition to the general remedial purposes of the RICO regime to which VICAR belongs, the statute targets violent crimes that are integrally related to criminal organizations or membership therein. *Concepcion*, 983 F.2d at 381 (noting that the purpose requirement "was included as a means of proscribing murder and other violent crimes committed 'as an integral aspect of membership' in such enterprises" (quoting S. Rep. No. 98-225, at 304-07 (1983) ("S. Rep. No. 98-225")). We think it obvious that these remedial purposes would be ill served by requiring the government to prove that the defendant acted *primarily* or *solely* for the purpose of enhancing or maintaining his position within the organization. It would make little sense to provide a safe-harbor from VICAR for gang mem-

bers who can offer a plausible alternative motivation for their acts. We do not believe Congress thought the range of human motivations can be so easily catalogued and prioritized.

Banks also invokes the rule of lenity, arguing that the scope of the VICAR purpose element is ambiguous and should be construed in his favor. However, the rule of lenity applies only when the statutory language contains "grievous ambiguity or uncertainty" and "when, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." *United States v. Wyatt*, 408 F.3d 1257, 1262 (9th Cir. 2005) (quoting *United States v. Phillips*, 367 F.3d 846, 857 n.39 (9th Cir. 2004)) (internal quotations omitted); *United States v. Pearson*, 312 F.3d 1287, 1289 (9th Cir. 2002). Although Banks has shown that "it is possible to articulate a construction more narrow than that urged by the Government," such a showing does not, without more, justify a finding of ambiguity. *Lisbey v. Gonzales*, 420 F.3d 930, 933 (9th Cir. 2005); *see also Pearson*, 312 F.3d at 1289 ("Lenity cannot be invoked merely because a different reading of the statute is possible."). We have declared statutes ambiguous and applied the rule of lenity only when " 'a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute.' " *Lisbey*, 420 F.3d at 933 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). As the foregoing analysis demonstrates, an examination of the text, context, and purpose of the VICAR statute leaves no reasonable doubt that the purpose element is satisfied "whether [the defendant's gang-related purpose] be primary or secondary." *Hughes*, 282 F.3d at 1231; *see also Concepcion*, 983 F.2d at 380 (declining to apply rule of lenity to VICAR's purpose element because the statute was not ambiguous).

**[4]** Because the text of the statute is clear and conforms with both its context and purpose, we join our sister circuits and hold that the purpose element does not require the Gov-

ernment to show that the defendant was solely, exclusively, or even primarily motivated by a desire to gain entry into, or maintain or increase his status within, the criminal organization. *See, e.g.*, *United States v. Concepcion*, 983 F.2d 369.

We do not mean to say, however, that a defendant falls within the scope of VICAR if his desire to enhance or maintain his status in the organization had any role, no matter how incidental, in his decision to commit a violent act. To adopt such a broad interpretation would risk extending VICAR to any violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang; if the reach of this element were not cabined in some way, prosecutors might attempt to turn every spontaneous act or threat of violence by a gang member into a VICAR offense. The VICAR statute itself contains no indication that Congress intended it to make gang membership a status offense such that mere membership plus proof of a criminal act would be sufficient to prove a VICAR violation. Otherwise, every traffic altercation or act of domestic violence, when committed by a gang member, could be prosecuted under VICAR as well.

**[5]** Though our sister circuits have rejected the proposition that the defendant's purpose to maintain or enhance his status must be his sole or primary purpose, they have not addressed the question from the other side—whether the purpose element is met if it is simply one of several purposes, regardless of how incidental the gang-related motivation was in his commission of the violent act. However, the language in these cases suggests that a limit does exist. *Concepcion*, for example, speaks of the defendant's "general purpose" and seized upon language in the legislative history suggesting that the violent act must be committed " 'as an integral aspect of membership' " in the gang. 983 F.2d at 381 (quoting S. Rep. No. 98-225, at 304). Other circuits have employed the "general purpose" or "integral aspect" formulation. *See Smith*, 413

F.3d at 1277 (describing the purpose element as relating to defendant's "general purpose"); *Tse*, 135 F.3d at 206 (affirming a district court's instruction that purpose element went to the question of the defendant's "general motive"); *Wilson*, 116 F.3d at 1078 (describing the purpose element as involving acts that are committed "as an integral aspect of membership in [criminal] enterprises"); *Fiel*, 35 F.3d at 1003-04 (describing the purpose element in terms of "violent crimes committed as an integral aspect of membership in [criminal] enterprises" (internal quotation marks omitted)). Together, these cases suggest that, although the law does not require that the defendant's gang-related purpose be his primary or sole purpose, it does require that his purpose be more than merely incidental: It must be within his "general" purpose, or, in the alternative, the violence committed must be in some way "integral" to the defendant's membership in the gang.[3]

[6] Although we think the question is a close one, we conclude that the instructions given by the district court here were erroneous because they permitted the jury to convict Banks on the VICAR counts even if it found that his battle with Gilmore was generally motivated by personal animosity and by a desire to regain the respect and affection of his girlfriend, so long as the jury also found some *incidental* purpose to maintain his position in the gang. By permitting the jury to find only that Banks's desire to maintain or enhance his status in the gang was "one of" or "at least one of" his purposes or

---

[3]The Mann Act cases cited above also took this approach, limiting application of the Act to those situations where the immoral purpose was "one of the [defendant's] dominant purposes." *Salter*, 346 F.2d at 511; *see also Fox*, 425 F.2d at 999. In other words, "[t]he illicit purpose denounced by the Act may have coexisted with other purpose or purposes, but it must have been an efficient and compelling purpose." *Dunn*, 190 F.2d at 497; *see also Mellor v. United States*, 160 F.2d 757, 764 (8th Cir. 1947) (upholding a jury instruction stating that the government had to prove that the immoral purpose was "not a mere incident but rather an efficient purpose prompting and impelling the defendants to the transportation of the girls").

"at least in part" due to his membership in the gang, the district court ran the risk that the jury would focus not on Banks's general purpose in committing these crimes and its relationship to his status in the gang, but merely on his status as a gang member. Given that status, the jury could easily infer that he acted "at least in part" to enhance his membership and status within the gang.

We are persuaded that VICAR requires more than this. People often act with mixed motives, so the gang or racketeering enterprise purpose does not have to be the only purpose or the main purpose of the murder or assault. But it does have to be a substantial purpose. Murder *while* a gang member is not necessarily a murder *for the purpose* of maintaining or increasing position in a gang, even if it would have the effect of maintaining or increasing position in a gang.[4] By limiting the statute's scope to those cases in which the jury finds that one of the defendant's general purposes or dominant purposes was to enhance his status or that the violent act was committed "as an integral aspect" of gang membership, we ensure that the statute is given its full scope, without allowing it to be used to turn every criminal act by a gang member into a federal crime.

## B. *Sufficiency of the Evidence*

Banks next argues that the evidence to convict him on the VICAR counts was insufficient because the government's evidence failed to establish that his actions were motivated by anything more than a desire for personal revenge.[5] We review

---

[4]The Supreme Court has expressed similar concerns in the context of a provision excluding aliens entering for the purpose of prostitution: "People not of good moral character like others, travel from place to place and change their residence. But to say that because they indulge in illegal or immoral acts, they travel for that purpose, is to emphasize that which is incidental and ignore what is of primary significance." *Hansen v. Haff*, 291 U.S. 559, 562-63 (1934).

[5]We reach this claim despite our reversal of Banks's VICAR convictions based on the jury instructions because "if the evidence is insufficient

claims of insufficient evidence de novo. *United States v. Odom*, 329 F.3d 1032, 1034 (9th Cir. 2003). "Evidence is insufficient to support a conviction if, when viewed in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999) (internal quotation marks omitted). As noted above, evidence is sufficient to convict under the purpose element of the VICAR statute if his general purpose was to maintain or enhance his position within the gang or if the violent act was committed as an integral aspect of his membership within the gang. *See Smith*, 413 F.3d at 1277; *Wilson*, 116 F.3d at 1078.

For defendants in some criminal organizations, proving the purpose element is straightforward. Such organizations often have clearly delineated rules for establishing, maintaining, and improving one's position within the organization, and the formality of the group's structure makes it a simple matter to determine the relationship between the defendant's actions and his status within the organization. *See, e.g.*, *Bracy*, 67 F.3d at 1424-25 (describing structure of criminal organization); *Concepcion*, 983 F.2d at 375 (same). However, formal recognition by an organization's hierarchy has never been required to establish the purpose element of the VICAR statute. In *Fernandez*, for example, we held that the government need not prove that the defendants, who were members of the Mexican mafia, acted with the purpose of enhancing their position "in the eyes of the enterprise itself"; rather, it was sufficient that the motivation was to do so in the eyes of "individuals or factions within the enterprise." 388 F.3d at 1232.

**[7]** In our prior VICAR cases, we have not addressed violence related to membership in a street gang like that pres-

on any count, the Double Jeopardy Clause would bar retrial on that count." *United States v. Shipsey*, 190 F.3d 1081, 1088 (9th Cir. 1999) (citing *United States v. Aguilar*, 80 F.3d 329, 334 (9th Cir. 1996) (en banc)).

ented here, but our decision in *Fernandez* implies that the evidence is sufficient for a VICAR conviction even if, for example, the jury could reasonably infer no more than that Banks acted out of concern for his status in the eyes of his "little homies" within the gang, or his reputation among other gang members generally. Our sister circuits have taken a similar approach. For example, in *Smith*, the Tenth Circuit upheld the VICAR conviction of a member of the King Mafia Disciples ("KMD"), a group that had been formed by six individuals in juvenile detention in Salt Lake City. *Smith*, 413 F.3d at 1264. There, the court noted that "acts of violence were a common part of KMD's culture and that members were expected to retaliate against acts of violence committed on fellow members." *Id.* at 1278. Members were expected to live up to their gang nicknames by committing acts of violence. *Id.* The court held that together this evidence was sufficient to permit the jury to infer that the crime was "committed as an integral aspect of membership in KMD." *Id.* at 1277 (internal quotation marks and alterations omitted).

Similarly, in *Wilson*, the Fifth Circuit upheld VICAR convictions for members of the Bottoms Boys, a street gang in Shreveport, Louisiana, based on evidence relating to gang customs and expectations. 116 F.3d at 1078. Among the evidence presented was the custom of "throwing" rival gang signs: Gangs would identify themselves with hand gestures, and one's response indicated whether he respected or "dissed" the other's gang. *Id.* The evidence showed that members were expected to retaliate violently when "dissed" by other gang members. *Id.* Although the court acknowledged that VICAR does not criminalize "mere retaliation for 'dissing' an individual or social organization," the nature of the organization, which relied on violence to secure its role in drug trafficking, meant that "a reasonable jury could find that violent retaliation for acts of disrespect promoted the goals of [the] illegal enterprise." *Id.*; *see also United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996) (holding that the purpose element of VICAR was satisfied where the enterprise expected affronts

to gang members to be met with a violent response); *Fiel*, 35 F.3d at 1004-05 (holding that the jury could reasonably conclude that participation in an inter-gang war was expected of gang members); *United States v. Boyd*, 792 F. Supp. 1083, 1102 (N.D. Ill. 1992) (holding that the purpose element is satisfied where aversion to violent acts would "invite trouble" from other gang members).

The evidence presented regarding Banks and the Rolling 60s is arguably less conclusive than that presented in the cases above, *see, e.g.*, *Smith*, 413 F.3d at 1278 (noting the "extensive testimony" that "acts of violence were a common part of [the gang's] culture"), and we believe that a jury could reasonably have concluded that Banks was motivated primarily, or even exclusively, by a personal vendetta against Gilmore. That, however, is not the test for sufficiency of the evidence. Rather, we must ask whether "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Daas*, 198 F.3d at 1174.

The answer to that question is unequivocally "no." The evidence regarding Banks's purpose in making multiple attempts on Gilmore's life, though not conclusive, would certainly have been sufficient to permit a properly instructed jury to infer that he had acted for the purpose of maintaining or enhancing his position within the Rolling 60s. Several government witnesses testified about customs within the Rolling 60s and about the gang's expectations of its members. For example, Detective Bateson described the types of acts that can cause a member to lose the respect of his comrades and the consequences of that loss of respect. Another witness, a former gang member, testified that the Crips would expect a member of their gang to retaliate violently to the insult of being called a crab; if a member failed to do so, he would be considered "a buster and a punk . . . that means nobody's gonna respect you." Furthermore, Banks himself testified that he had enlisted his "little homies" in the gang to beat up and shoot at Gilmore on his behalf, implying that what motivated

Banks to repeatedly attack Gilmore could have been—or had become—more than a merely personal vendetta.

In addition to the evidence involving the attempt on Gilmore's life, the government also introduced evidence of a prior attack by Banks on one Mr. Lindsey. Banks had been previously convicted for stabbing Lindsey in 2000. According to testimony given by two LVMPD police officers, in 2000, the two men had gotten into a fistfight, and Banks, in his own words, "got whooped on." Banks told the police that when his girlfriend learned of the fight, she "basically called him a punk" and said that "being that he's in a gang, being in the Rolling 60s, [ ] she [could not] believe that he's not taking care of business." She "became upset[,] began yelling at him[,] kind of taunting him" for not standing up for himself, asking "what kind of Crip gang member are you?"

The evidence of the circumstances surrounding this prior stabbing lends further support to the government's allegation that Banks acted with the purpose of maintaining or enhancing his status within the Rolling 60s. It tends to show that Banks was concerned with his standing within the Rolling 60s and was willing to act violently to preserve it. It also demonstrates that Banks was fully capable of acting with dual purposes.

[8] Given the evidence regarding the expectations that the Rolling 60s held toward its members, the importance of maintaining one's status by responding with violence to perceived slights, Banks's own concerns with not appearing weak, his use of gang members to pursue Gilmore, and his prior attack on Lindsey, a properly instructed jury could reasonably have inferred that one of Banks's general purposes was to maintain his position in the Rolling 60s. We therefore decline to reverse the district court's conviction for insufficient evidence.

### C.   Failure to Declare a Mistrial and Improper Allen Charge

Banks next argues that the district court handled the jury's indication that it was deadlocked improperly and suggests that the district court should have probed into the likelihood of the jurors' reaching a verdict—and perhaps then declared a mistrial—before issuing what Banks characterizes as a de facto *Allen* charge to the jury.[6] Three hours after deliberations began, the court received a note from the foreperson stating that three jurors believed that the government had not proven the elements of the VICAR charge beyond a reasonable doubt. Specifically, they doubted that the government had proved the purpose element and did "not think they [would] change their minds." Banks's counsel moved for a mistrial, and the government stated that it did not object. However, when Banks was brought into the courtroom, he indicated that he did not agree with the motion for a mistrial.

The government suggested that the court could declare a mistrial sua sponte. However, after researching the issue overnight, the district court concluded that declaring a mistrial based only on the communication to him of the current vote tally would be unjustified. Instead, the court had decided to charge the jury not to reveal its vote tally again and to admonish it to continue deliberations. Defense counsel agreed with this approach. After two more hours of deliberation, the jury again noted that they were "deadlocked on the verdicts." The court suggested bringing the jury into the courtroom to inform

---

[6]The term "*Allen* charge" refers to a jury instruction at issue in *Allen v. United States*, 164 U.S. 492 (1896). In *Allen*, the trial court had provided supplemental instructions to the jury after it had spent some time deliberating without having reached unanimity. In these instructions, the court exhorted the jurors that they should decide the case if possible and keep an open mind in their deliberations, with a willingness to be convinced, and that "a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself." *Id.* at 501.

the jurors that deadlocks usually occurred after a longer period and to encourage them to continue deliberations. The government agreed. Defense counsel expressed his concern that the jury appeared to be convinced in its current position but also acknowledged that he did "understand it [was] too early" to declare a mistrial.

The jury was brought into the courtroom at 11:45 am, and the judge delivered the following statement:

> Let me just inform you of the time parameters since many of you have not served on juries before. Usually a deadlock occurs after—after many, many hours of deliberation, sometimes days, and not—not just a few minutes. And—and from the very beginning of your deliberations, we have received notes indicating after not too much time spent in the jury room that you are deadlocked.
>
> Your deliberations have been interrupted several times while awaiting a response from the Court and that is because it takes time to contact counsel and in some cases have counsel appear if they request to be present while you are instructed.
>
> It is obvious that you have been taking votes; however, in the Court's view, the time for discussion has been short comparatively speaking. It does not appear to me that you have had enough time to conduct the thorough, ongoing discussion that would proceed [sic] a unanimous verdict. I'm going to ask you to return to the jury room. I'm going to ask you to review all of the evidence consisting of the testimony and exhibits admitted by the Court. You need to discuss all of that very thoroughly to go over it, evaluate it in the light of reason and common experience and then use reason and persuasion to arrive at a verdict.

> Review the jury instructions which will inform you of what is required for you to reach a verdict on all of the counts. You do not have to surrender your honest convictions to arrive at a verdict; however, your decision must be based on—and your individual decisions must be based on logic and a consideration of all the evidence and—and based on a thorough discussion of—of those jury instructions and all the evidence that has been presented in the case.
>
> And to just fold your arms and—and refuse to discuss is—is not what is expected. It is expected that you will—you will all discuss and point to various pieces of evidence or lack of evidence, if that is that case, and—and deliberate very thoroughly in arriving at your verdict.

Neither the government nor defense counsel added any comments or made any objection. The jury returned a unanimous guilty verdict at 2:39 pm.

We generally review the district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Allen*, 341 F.3d 870, 891 (9th Cir. 2003); *United States v. Green*, 962 F.2d 938, 944 (9th Cir. 1992) ("We accord great deference to a trial judge's decision whether to declare a mistrial because of jury deadlock."). However, when the motion is withdrawn by the defendant, we review the district court's failure to sua sponte declare a mistrial for plain error. *See United States v. Greenbank*, 491 F.2d 184, 188 (9th Cir. 1974). We address this issue even though we reverse Appellant's conviction on the VICAR counts because Banks appears to argue that the district court should have declared a mistrial as to all counts, thereby terminating the proceedings as a whole.

The same standard applies to our review of the district court's supplemental instructions to the jury. Although such

instructions, including *Allen* charges, are typically reviewed for abuse of discretion, *see United States v. Steele*, 298 F.3d 906, 909 (9th Cir. 2002), Banks did not object to those instructions at the time they were given. We therefore review the district court's instructions for plain error. *See United States v. Olano*, 62 F.3d 1180, 1201 (9th Cir. 1995). Under plain error review, we may reverse a district court's decision only when the defendant establishes that (1) the district court has erred; (2) the error is plain, or "obvious," under current law; (3) the error "affect[s] substantial rights" of the defendant; and (4) the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 733-37 (1993) (internal quotations omitted).

**[9]** Given the district court's wide discretion in deciding whether to declare a mistrial sua sponte and the absence of any coercive element in the instructions, we cannot conclude that the district court plainly erred. As to the first issue, we have held that the district court should consider several factors when determining whether it should sua sponte declare a mistrial. These factors include "the jury's collective opinion that it cannot agree, the length of the trial and complexity of the issues, the length of time the jury has deliberated, whether the defendant has objected to a mistrial, and the effects of exhaustion or coercion on the jury." *United States v. Hernandez-Guardado*, 228 F.3d 1017, 1029 (9th Cir. 2000). In the proceedings below, only the first of these factors weighed in favor of declaring a mistrial; aside from the jury's apparent belief that it was deadlocked, all of the other factors weighed against declaring a mistrial.

**[10]** Our decision in *United States v. Changco*, 1 F.3d 837 (9th Cir. 1993), is instructive here. In that case, the defendant moved for a mistrial after the jury foreperson sent a note to the court stating, "Can't convince one person. Don't know what to do. Set mind before case. She can't hear well and is not looking at evidence." *Id.* at 842. We held that the district

court did not err in denying the motion to declare a mistrial. *Id.* at 843. This case is no different—the jury here engaged in nearly identical behavior, and the judge did not actively seek out the numerical division of the jury. Moreover, as noted above, Banks himself withdrew his motion for a mistrial. Given these factors, sua sponte declaration of a mistrial was not manifestly necessary.

**[11]** Likewise, the district court did not commit plain error by giving supplemental instructions to the jury, even assuming that these instructions somehow amounted to a "de facto *Allen* charge," as Banks contends. Such charges are proper "in all cases except those where it's clear from the record that the charge had an impermissibly coercive effect on the jury." *United States v. Ajiboye*, 961 F.2d 892, 893 (9th Cir. 1992) (internal quotation marks omitted); *see also United States v. Lorenzo*, 43 F.3d 1303, 1307 (9th Cir. 1995). Banks has provided no evidence that the district court's instructions had such an effect.

The instructions the judge gave here are comparable to past cases in which this Court has held that the instructions given were not impermissibly coercive. In *Changco*, for example, we held that there was no impermissible coercion where the foreperson had informed the court that one holdout remained, and the district court responded by directing the jury not to disclose its numerical division again, urging them to continue deliberating and to try to reach a verdict, and encouraging "individual jurors not to surrender their conscientiously-held beliefs." *Changco*, 1 F.3d at 842. Similarly, in *Lorenzo*, we held that even where the jury was split 11-1, an *Allen* charge given by the judge was not inherently coercive because the judge did not know the identity of the holdout juror; this, in turn, meant that it was unlikely that the lone holdout felt unduly pressured by the judge's remarks. *Lorenzo*, 43 F.3d at 1307.

Banks fails to show how the district court's instructions in this case materially differ from those at issue in *Lorenzo* and

*Changco*. First, because the jury's note stated that three jurors were holding out and did not provide any information about the holdouts that would permit the judge to identify them, there was little possibility that the judge could place pressure on any given juror. *Cf. Lorenzo*, 43 F.3d at 1307 (holding that an *Allen* charge was not inherently coercive even though jury was split 11-1 because the judge did not know the identity of the holdout juror). In fact, the judge here did not give his supplemental instruction immediately after receiving the note identifying the current vote tally; the jurors continued deliberating for an additional two hours and did not inform the court of the latest vote tally before the supplemental instructions were issued. Second, unlike in *Changco*, there was no evidence of coercion of the holdouts by the other jurors. Third, the judge here gave the supplemental instructions only once; the jury continued deliberating at least two hours before reaching its verdict; and the jury appears to have requested portions of the evidence to be shown to them again. *See id.* (identifying all of these factors as relevant in determining whether instruction was coercive); *United States v. Bonam*, 772 F.2d 1449, 1451 (9th Cir. 1985) (stating that announcement of verdict 90 minutes after instruction did not raise suspicion of coercion); *United States v. Beattie*, 613 F.2d 762, 765 (9th Cir. 1980) (noting length of post-instruction deliberation to be relevant in determining whether instruction was coercive). Finally, the judge emphasized that he was encouraging the jurors to engage in discussion and not to "surrender [their] honest convictions" in the process. *See Green*, 962 F.2d at 944 (stating that "cautionary statements" made supplemental instruction "even less coercive than simply asking the jury to continue deliberating").

**[12]** In sum, these factors "make[ ] it far from clear" that the charge given by the judge here—even assuming it was an *Allen* charge—had a coercive effect on the jury. *See Daas*, 198 F.3d at 1180. Consequently, we hold that the district court did not plainly err (if it erred at all) when it declined to

declare a mistrial and instead gave supplemental instructions that encouraged the jury to continue deliberations.

### D. *Evidence of Facts Underlying Prior Convictions*

Banks also contends that the judge should have excluded evidence regarding the violent acts underlying his prior felony conviction, namely his retaliatory stabbing of Lindsey, under Federal Rule of Evidence 404(b). Although we generally review the district court's evidentiary rulings for abuse of discretion, *see Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997); *United States v. Lynch*, 367 F.3d 1148, 1159 (9th Cir. 2004), we review the district court's ruling for plain error when the defendant did not object during trial on the basis he asserts on appeal. *United States v. Sioux*, 362 F.3d 1241, 1245 n.5 (9th Cir. 2004). Because Banks objected to admission of this evidence only on the basis that the parties had already stipulated to the fact of conviction, and not on the basis of Rule 404(b), we review the district court's admission of the evidence for plain error.

**[13]** Rule 404(b) provides that the district court may admit evidence of prior bad acts if it "(1) tends to prove a material point; (2) is not too remote in time; (3) is based upon sufficient evidence; and, (4) in some cases, is similar to the offense charged." *United States v. Robertson*, 15 F.3d 862, 870 (9th cir. 1994), *rev'd on other grounds*, 514 U.S. 669 (1995). Even if the proffered evidence satisfies these requirements, the district court should decline to admit it "if its probative value is substantially outweighed by the danger of unfair prejudice." *Id*.; FED. R. EVID. 403.

Prior to trial, Banks moved to sever the felon-in-possession count, but the government offered in return—and Banks agreed—to stipulate to the fact of the prior conviction. During trial, the government sought to introduce the facts underlying that conviction as evidence of his concern with maintaining his status in the Rolling 60s, even if it required the use of vio-

lence. As discussed above, the evidence established that Banks had stabbed a man named Lindsey, who had "whupped up on" Banks. Moreover, the government's evidence tended to show that the stabbing occurred after Banks's girlfriend had called him a "punk" and accused him of not taking care of Rolling 60s business by letting Lindsey beat up on him.

Banks objected to admission of this evidence on the grounds that he had stipulated to the fact of the subsequent conviction. The government, however, argued that the evidence was relevant to the VICAR counts because it showed that Banks was concerned about, and willing to retaliate violently in response to, threats to his status in the gang. The court admitted the evidence but warned the government to "[s]tay away from" the already-stipulated-to conviction.

**[14]** On appeal, Banks argues that the district court's admission of this evidence was improper for three reasons. None have any merit. First, he argues that the evidence was not relevant to determining Banks's motive in attempting to murder Gilmore. However, as discussed in the context of his sufficiency of the evidence claim, evidence that Banks attacked Lindsey only after, and in response to, his girlfriend's taunts about his status in the Rolling 60s is directly relevant to proving that Banks was committed to maintaining his gang status even if he had to engage in violent behavior to do so. Second, he argues that the Lindsey stabbing predated his attempted murder of Gilmore, implying that it was too far removed in time to be admissible under Rule 404(b). But his attack on Lindsey occurred only four years prior to Banks's acts here, which is not remote in time, particularly given the government's reason for introducing the evidence—i.e., to show motive—and Banks's continued membership in the Rolling 60s during that entire period. Finally, he argues that the evidence was prejudicial, in that it helped portray Banks as a violent individual and thus appealed to the emotions of the jury. However, there is nothing inherent in this evidence that would create a risk that he would be convicted "on a

ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180; *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005). Nothing in the facts would shock the average juror or otherwise render the jury incapable of weighing the evidence in a disinterested manner. And even assuming that the evidence had some prejudicial effect, given the relevance of the evidence to the question of motive, we cannot say that any prejudice it might have caused outweighed its significant probative value.

### E. Cumulative Error

Banks's final argument is an omnibus claim that evidence regarding his "uncharged misconduct," though not plainly erroneous on its own, created a "prejudicial cumulative effect" and creates a "miscarriage of justice." Because no objection to the evidence he challenges on appeal was made during trial, we again review the district court's evidentiary rulings for plain error. *See United States v. Morris*, 827 F.2d 1348, 1350 (9th Cir. 1987). This claim fails because Banks has not shown that any of the alleged errors were, in fact, errors.

Banks points to the testimony of two witnesses, both police officers, as improperly admitted and cumulatively prejudicial. First, Detective Majewski testified regarding his discovery of "imitation crack" in Banks's shoe when he arrested Banks on an outstanding warrant. Second, Officer Ziel testified that he found several rocks of cocaine, each wrapped in plastic, under Banks's tongue during a search.

**[15]** As the government points out, this evidence went directly to showing that Banks engaged in the type of activity that characterized the Rolling 60s, the organization underlying the VICAR statute. Because one element of VICAR is membership in a racketeering organization, this evidence of other wrongful acts was directly relevant to establishing an element of the charged offense. As the district court did not err in

admitting this evidence, Banks cannot establish that he was prejudiced by cumulative error.

## III

Because the district court erred by instructing the jury that it could convict Banks under the VICAR statute if it found that any element of his motivation, no matter how incidental, in assaulting Gilmore was to maintain his membership in the Rolling 60s, we REVERSE his conviction and sentence as to the two VICAR counts and REVERSE his conviction and sentence as to the two use of firearm counts, which were predicated on his VICAR convictions. *See United States v. Ritter*, 989 F.2d 318, 322 (9th Cir. 1993). We REMAND for further proceedings and AFFIRM the district court in all other respects.

REVERSED and REMANDED in part; AFFIRMED in part.